**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

**No. 17-4266**

———————————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

    v.

ANTHONY L. BURFOOT,

              Defendant - Appellant.

———————————

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  Henry Coke Morgan, Jr., Senior District Judge.  (2:16-cr-00006-HCM-DEM-1)

———————————

Argued:  May 8, 2018                               Decided:  August 8, 2018

———————————

Before GREGORY, Chief Judge, and KEENAN and DIAZ, Circuit Judges.

———————————

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Chief Judge Gregory and Judge Keenan joined.

———————————

**ARGUED:** Andrew Michael Sacks, SACKS & SACKS, Norfolk, Virginia, for Appellant. Uzo Enyinnaya Asonye, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Dana J. Boente, United States Attorney, Alexandria, Virginia, Melissa E. O'Boyle, Assistant United States Attorney, Katherine Lee Martin, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

———————————

DIAZ, Circuit Judge:

After a five-week jury trial, Anthony L. Burfoot was convicted of wire fraud, extortion under color of official right, conspiracy to commit such offenses, and two counts of perjury. The wire fraud, extortion, and conspiracy charges stem from Burfoot's solicitation of bribes from local real estate developers while serving on the city council in Norfolk, Virginia. And he was charged with perjury following his testimony in another trial in which he denied soliciting or accepting bribes. As we explain, we reject the issues raised by Burfoot's appeal and affirm the district court's judgment.

I.

In 2002, Burfoot was elected to serve on the Norfolk City Council. Around the same time, Burfoot's childhood acquaintance Curtis Etheridge ("Curtis") formed a development and construction company called Tivest. Although Burfoot didn't invest financially in Tivest, he was a "silent partner" in the enterprise. J.A. 950. According to Curtis, Burfoot promised to "set the table up" for Tivest by providing it with tax-funded construction projects in Norfolk. J.A. 801. Between 2004 and 2005, Curtis provided Burfoot with various perks, including $20,000 to $30,000 worth of home improvements at no charge. Curtis also frequently paid for Burfoot's meals, trips, and entertainment.

In early 2005, Curtis was convicted of making a false 911 call and impersonating a police officer while at a nightclub. After the local newspaper reported that Burfoot had been with Curtis at the club that evening, Burfoot decided to distance himself from Tivest. He met with Curtis and another Tivest principal, Recardo Lewis, to discuss his role in the

2

company. Curtis's brother, Dwight Etheridge ("Dwight"), was also at the meeting. Burfoot told them that he wanted Dwight to "buy him out" of his interest in Tivest for $250,000. J.A. 953. In exchange, Burfoot would ensure the City awarded Tivest a large construction contract for a development project known as the Broad Creek Villas, which he said would include $600,000 of taxpayer funding for infrastructure. The Broad Creek Villas project, a mixed-use development located in Burfoot's ward, was going to be the "cash cow" for Tivest's future earnings. J.A. 837.

Lewis pushed back against Burfoot's buyout demand, pointing out that Burfoot hadn't actually invested any of his own money in the company. In response, Burfoot threatened to award the Broad Creek Villas project to another construction company. He also stated that there were other construction companies he could get things done with. As a result, the Etheridge brothers capitulated and, two days later, Dwight made an initial cash payment of $30,000 to Burfoot.

Over the next six years, Burfoot demanded and received hundreds of thousands of dollars in cash and gifts from Curtis and Dwight, including free home renovations, free meals and entertainment, use of Dwight's Porsche, and a free Mercedes concealed by a sham loan. Dwight ultimately became CEO of Tivest and Burfoot's primary source of cash and gifts. He met with Burfoot more than seventy times to hand off cash in various amounts, usually under $10,000.

Burfoot in turn voted to approve ordinances that awarded construction projects to Tivest or benefitted the company in other ways. In 2008, for example, Burfoot cast votes to ensure that the Broad Creek Villas project proceeded, and, on July 22, 2008, voted to

3

award the project to Tivest. Phone records show that Burfoot and Dwight spoke over the phone sixteen times that day. The ordinance awarding the project to Tivest granted the company a large plot of city-owned land for a nominal $10. It also provided Tivest with $200,000 in infrastructure support and a $5 million loan for construction.

Burfoot also cast votes in support of Tivest's MidTown Office Tower project, a proposed six-story office building that Tivest wanted to build on city-owned land. In November 2008, Burfoot voted to award Tivest the MidTown project, conveying a large parcel of land valued at $990,800 for no cost and $1 million in city funds to make improvements to the property. A week before the vote, Dwight—at Burfoot's direction—made a $1,000 payment on Burfoot's car loan and forged Burfoot's signature to conceal the source of the payment. Dwight also promised to give Burfoot a portion of the funds obtained from the MidTown project construction loan as well as a personal office on the top floor of the MidTown Office Tower.

In early 2011, the city council was poised to vote on an ordinance that would ensure Tivest could properly finance the MidTown project. Burfoot was serving as Norfolk's Chief Deputy Treasurer at the time, in addition to his role on the city council. Several days before the vote, on Saturday, February 12, the city council held a town hall meeting where citizens critical of the MidTown project alleged that Tivest was delinquent in paying its city taxes. After the meeting, Burfoot, afraid of losing the upcoming vote to finance the MidTown project, instructed Dwight to pay Tivest's taxes "as soon as the door opened up" on Monday. J.A. 1134. Burfoot also called one of his employees in the Treasurer's office, Wendy Petchel, and told her to prepare the paper work for Dwight to pay Tivest's taxes.

4

Early Monday morning, Dwight and Burfoot spoke over the phone, and then Dwight headed down to the City Treasurer's office where he and Burfoot discussed the tax payment. Burfoot then directed Dwight to see Petchel to make the payment. Petchel provided Dwight with an itemized breakdown of Tivest's delinquent taxes, which exceeded $20,000. Dwight wrote a check for a portion of the overdue taxes and used his sister's American Express credit card to pay the remaining $10,000 owed. Taxpayers typically weren't permitted to use another person's credit card to pay taxes, and a supervisor, like Petchel, would have had to approve that type of payment. Right after Dwight made the payment, he returned to Burfoot's office and told him the taxes were paid. Burfoot later directed Petchel to provide misleading information to the media regarding the timing of the tax payment.

The next day, Burfoot voted in favor of the ordinance to finance Tivest's MidTown project, which passed on a 5-3 vote. One city council member testified that he wouldn't have cast his vote in favor of the ordinance if Tivest had been delinquent on its taxes. But this big win for Burfoot and Tivest was short lived. A week later, the City announced it wouldn't move forward with the MidTown project because the anchor tenant couldn't confirm its participation. At this point, Dwight was out of money so Burfoot and Dwight parted ways.

Burfoot's relationship with Tivest wasn't his only quid pro quo relationship with a local developer. Shortly after Burfoot was elected to city council in 2002, he met restaurant owner and real estate developer Ronald Boone. Burfoot asked for and received thousands of dollars in cash payments from Boone, as well as regular access to Boone's beach house

in Kitty Hawk, North Carolina. In exchange, Burfoot cast votes to support Boone's business interests.

Burfoot established a similar relationship with Thomas Arney, another local developer. Arney had recently developed a condominium project known as Widgeon Pointe, which was financed by the Bank of the Commonwealth (the "BOC"). Tammy Sansbury, the mother of Burfoot's twin daughters, worked at the BOC and wanted to buy a Widgeon Pointe condominium, but she didn't have the money for the down payment. In May 2009, Burfoot asked Arney to give Sansbury $25,000 so that she could purchase the condominium. In exchange, Burfoot promised to get Arney the city council votes he needed to open his proposed gentlemen's club. The two men shook on the agreement.

Although the city council never approved the gentlemen's club, Arney gave Sansbury the $25,000 and sold her a condominium unit in exchange for Burfoot's promise to support Arney's other business interests. Burfoot followed through on his promise, voting and lobbying for ordinances that allowed Arney to open a new bar and use an oversized sign to advertise it.

Federal investigators eventually turned their attention to Arney's corrupt relationship with BOC executives and insiders. Arney began cooperating with federal agents and told them about his $25,000 payment to Sansbury (a BOC employee) in exchange for Burfoot's votes. He pleaded guilty and testified in a federal criminal trial (the "*Woodard* trial") against four BOC executives and Dwight from Tivest, who were all being tried on various charges of bank fraud and improper use of bank funds. After Arney testified about his bribery scheme with Burfoot, a BOC executive subpoenaed Burfoot as

6

a witness. On the witness stand at the *Woodard* trial, Burfoot denied ever asking Arney to give Sansbury $25,000. Burfoot also denied ever soliciting or accepting anything of value in exchange for an official act.

A grand jury ultimately charged Burfoot in an eight-count indictment with (1) conspiracy to commit honest-services wire fraud, in violation of 18 U.S.C. § 1349; (2) honest-services wire fraud, in violation of 18 U.S.C. § 1343; (3) conspiracy to obtain property under color of official right ("Hobbs Act extortion"), in violation of 18 U.S.C. § 1951; (4) Hobbs Act extortion, in violation of 18 U.S.C. § 1951; and (5) four counts of perjury, in violation of 18 U.S.C. § 1623. After a five-week trial, a jury found Burfoot guilty on six of the eight counts, while acquitting him on two of the perjury counts. The district court denied Burfoot's post-trial motions for a judgment of acquittal or a new trial and sentenced Burfoot to six years in prison.

## II.

On appeal, Burfoot contends that the district court erred in denying his Federal Rule of Criminal Procedure 29 motions for a judgment of acquittal where he challenged the sufficiency of the evidence for all six counts of conviction and argued that the substantive Hobbs Act extortion count was defective. He also argues that the district court erred in denying his Federal Rule of Criminal Procedure 33 motions for a new trial on the basis of inadmissible testimony, newly discovered evidence, and the jury's failure to fully deliberate. We address these issues in turn.

7

## A.

Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. We review de novo a district court's denial of a Rule 29 motion. *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005). We must sustain a guilty verdict if, viewing the evidence in the light most favorable to the prosecution, the verdict is supported by substantial evidence. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996). Substantial evidence is that which "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* We don't consider the credibility of witnesses and must assume the jury resolved all contradictions in testimony in the government's favor. *Id.*

Burfoot argues that the district court should have acquitted him on all counts. He claims: (1) there was insufficient evidence to support the four convictions arising from his alleged bribery schemes because the evidence only established that he engaged in a conflict of interest; (2) there was insufficient evidence to support the honest-services wire fraud convictions because Dwight's use of an interstate wire transfer to pay Tivest's delinquent taxes was unforeseeable and required by law; (3) the substantive conviction of Hobbs Act extortion was duplicitous, time barred, and constructively amended; and (4) there was insufficient evidence of materiality to support his perjury convictions.

### 1. Insufficient Evidence of Bribery

Burfoot contends the evidence failed to show he engaged in bribery, and that such evidence is necessary to sustain his convictions under counts one and two (conspiracy to

commit wire fraud and wire fraud) and counts three and four (conspiracy to commit Hobbs Act extortion and Hobbs Act extortion). According to Burfoot, the evidence showed only that he improperly voted on city council matters in which he had an undisclosed financial interest. We disagree.

To begin, the jury clearly found that Burfoot engaged in bribery. The jury instructions for counts one and two required the jury to find that the offenses were committed "through bribery" and the instructions for counts three and four required the jury to find that Burfoot knew he would obtain a thing of value in return for an official act. J.A. 4408, 4415–19. Further, substantial evidence supports the jury's finding of bribery. For example, Dwight, Curtis, and Lewis all testified as to their agreement to give Burfoot $250,000 in exchange for Burfoot's efforts to award Tivest the Broad Creek Villas project. A reasonable jury could find such an agreement to constitute a bribe. Dwight also testified to a quid pro quo relationship with Burfoot that went "over and beyond the $250,000." J.A. 995. And multiple witnesses, bank and phone records, and evidence of other financial transactions support the jury's finding of bribery.

### 2. Insufficient Evidence of Honest-Services Wire Fraud

Burfoot next argues that the evidence is insufficient to support his convictions for wire fraud and conspiracy to commit wire fraud. Wire fraud under 18 U.S.C. § 1343 requires evidence showing that the defendant (1) devised or intended to devise a scheme to defraud and (2) used or caused the use of wire communications in furtherance of that scheme. *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012). A wire communication is in furtherance of a scheme to defraud if it's a "step in the plot" or "incident to an essential

9

part of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (internal quotation marks omitted); *see also S. Atl. Ltd. P'ship of Tenn. v. Riese*, 284 F.3d 518, 531–32 (4th Cir. 2002) (applying *Schmuck* to wire fraud offense). One "causes" the use of a wire communication when one acts with knowledge that such use "will follow in the ordinary course of business" or where such use "can reasonably be foreseen, even though not actually intended." *United States v. Pierce*, 400 F.3d 176, 180 (4th Cir. 2005) (internal quotation marks omitted).

Conspiracy to commit wire fraud under 18 U.S.C. § 1349 requires a jury to find that (1) two or more persons agreed to commit wire fraud and (2) the defendant willfully joined the conspiracy with the intent to further its unlawful purpose. *See United States v. Chittenden*, 848 F.3d 188, 195 (4th Cir. 2017) (vacated on other grounds).

Burfoot argues that the evidence is insufficient to support either conviction because he didn't know—and couldn't reasonably foresee—that Dwight would use an interstate wire transfer to pay Tivest's delinquent taxes. Dwight testified, however, that Burfoot demanded he pay Tivest's $20,000 tax delinquency. The only question then is whether the *way* Dwight made the payment was reasonably foreseeable.

The government offered testimony and evidence about Burfoot's familiarity with the Treasurer's office (he was, in fact, the Chief Deputy Treasurer) and how the office routinely accepted credit card payments for tax obligations. Furthermore, the weekend before the vote to finance the MidTown Project, Dwight and Burfoot had numerous telephone conversations about Tivest's delinquent taxes and the need pay them before the vote. Dwight met with Burfoot in person at the Treasurer's office Monday morning before

10

the wire transfer, and Burfoot asked Dwight if he had the money to pay the taxes. Burfoot also sent Dwight to an office employee, Petchel, to make the payment. Dwight then took the invoices to Burfoot's office where Burfoot confirmed that the tax delinquency was fully paid. Given all this evidence, a reasonable jury could conclude that it was reasonably foreseeable that Dwight would use an interstate wire transfer in response to Burfoot's demand that he quickly pay Tivest's delinquent taxes.

Next, Burfoot argues the wire transfer used to pay Tivest's delinquent taxes wasn't in furtherance of a scheme to defraud because state and local laws required that the taxes be paid. For this proposition, Burfoot relies on *Parr v. United States*, in which members of a school board misappropriated and embezzled school district funds. 363 U.S. 370, 381 (1960). The board members had been convicted of mail fraud on the theory that they mailed out tax notices but then used taxpayers' money in unlawful ways. *Id.* at 378–81. The Court reversed their convictions, holding that the board members' mailing of tax notices couldn't constitute mail fraud because state law required such mailings. *Id.* at 391. Burfoot reasons that he, as Chief Deputy Treasurer, was likewise legally obligated to collect Tivest's delinquent taxes and Dwight was legally obligated to pay. Therefore, he concludes, the tax payment couldn't have constituted wire fraud.

However, *Parr* is inapposite. While the school board members in *Parr* were legally required to mail tax notices, Burfoot wasn't legally required to demand that Dwight immediately pay Tivest's delinquent taxes via an interstate wire transfer. Further, unlike the mailed notices in *Parr*, Dwight's interstate wire transfer was part of Burfoot and

11

Tivest's fraudulent scheme. The Supreme Court's more recent decision in *Schmuck v. United States* helps explain this point of distinction.

In *Schmuck*, a used-car distributor's mailing of car-title registration forms served as the basis of his mail fraud conviction. 489 U.S. at 712. Even though state law required car dealers to submit such forms, the Court reasoned that such mailings could still form the basis of the mail fraud conviction because they were part of the execution of the fraudulent scheme. *Id.* The Court distinguished *Parr*, noting that the mailings of tax notices "would have been made regardless of the defendants' fraudulent scheme." *Id.* at 713 n.7. "The relevant question at all times," said the Court, "is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Id.* at 715; *see also United States v. Grubb*, 11 F.3d 426, 435 (4th Cir. 1993) (upholding mail fraud conviction based on mailing of employee retirement premiums in compliance with County Commission's legal duty because, unlike the tax notices in *Parr*, they were "grounded wholly on an illegal scheme to defraud").

In this case, substantial evidence supports the jury's finding that the use of an interstate wire transfer to pay Tivest's delinquent taxes was part of the scheme to defraud. The payment was critical to secure city council support for the MidTown project, which was central to the bribery scheme involving Burfoot and Tivest. The bribery scheme—not state law—dictated the timing of the payment and manner in which it was made. Thus, we conclude that the district court correctly denied Burfoot's Rule 29 motion to acquit him of wire fraud.

3.  Defective Substantive Count of Hobbs Act Extortion

Burfoot argues that the district court should have acquitted him of Hobbs Act extortion (count four) because (i) the charge was duplicitous and encompassed conduct outside the applicable limitations period and (ii) the district court constructively amended the charge in its instructions to the jury.  We reject these arguments.

### i. Duplicitous and Time-Barred

An indictment is duplicitous if it "charges two offenses in one count."  *United States v. Robinson*, 855 F.3d 265, 269 (4th Cir. 2017).  A duplicitous indictment creates "the risk that a jury divided on two different offenses could nonetheless convict for the improperly fused double count."  *United States v. Robinson*, 627 F.3d 941, 957 (4th Cir. 2010).  "Such a jury would not unanimously agree on the offense that the defendant committed, violating the defendant's Sixth Amendment right to a unanimous verdict."  *Robinson*, 855 F.3d at 269–70.  Additionally, "[w]hen an indictment impermissibly joins separate offenses that occurred at different times, prosecution of the earlier acts may be barred by the statute of limitations."  *United States v. Smith*, 373 F.3d 561, 563 (4th Cir. 2004).

However, "two or more acts, each of which would constitute an offense standing alone . . . may instead be charged in a single count if those acts could be characterized as part of a single, continuing scheme."  *United States v. Kamalu*, 298 F. App'x 251, 254 (4th Cir. 2008) (unpublished) (quoting *United States v. Shorter*, 809 F.2d 54, 56 (D.C. Cir. 1987)); *see also United States v. Singer*, 782 F.3d 270, 276 (6th Cir. 2015); *United States v. Mancuso*, 718 F.3d 780, 792 (9th Cir. 2013); *United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006); *United States v. Davis*, 471 F.3d 783, 790–91 (7th Cir. 2006); *United*

13

*States v. Jaynes*, 75 F.3d 1493, 1502 (10th Cir. 1996).  And even if a count is duplicitous, it "is not to be dismissed unless it causes prejudice to the defendant."  *Kamalu*, 298 F. App'x at 254 (citing *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2011)).

Burfoot asserts that a single Hobbs Act violation occurs the moment interstate commerce is affected by a public official's receipt of a thing of value with the requisite knowledge that it was given in return for an official action.  He argues that count four of the indictment charges him with obtaining multiple things of value in return for various official acts.  As a result, he says, count four charges him with multiple offenses.  And because each act of extortion should be a separate count, he claims that all acts of extortion that occurred before January 7, 2011, are time-barred under the five-year statute of limitations for extortion offenses.  *See* 18 U.S.C. § 3282(a).

The district court rejected this argument on the basis that Burfoot's extortion was a "continuing scheme" and that the jury made a specific finding that an act in furtherance of this scheme occurred within the limitations period.  We agree.  Count four charges Burfoot with obtaining "approximately $50,000 and other things of value" from Tivest and its three principals, under color of official right, from October 2008 through February 2011.  Further, count four incorporates paragraphs 1 through 95 of the indictment's general allegations, which describe an ongoing extortion scheme in which Tivest continuously made cash payments in exchange for Burfoot's votes.  We are satisfied that count four characterizes Tivest's various payments to Burfoot as part of a continuous scheme.

Furthermore, count four doesn't implicate any of the policy concerns that underlie the doctrine against duplicitous charges.  We see no risk of double jeopardy or a non-

unanimous jury verdict.  Characterizing Tivest's many payments to Burfoot over the years as part of a continuous extortion scheme also avoids "unnecessarily complex and confusing allegations and the concomitant prejudice to the defendant of charging him with scores of substantive counts arising out of the scheme."  *Singer*, 782 F.3d at 276 (internal quotation marks and alteration omitted).

Finally, count four didn't charge Burfoot for time-barred conduct because it alleges a continuous scheme of extortion and Burfoot committed acts in furtherance of that scheme within the five-year limitations period.  Although we've yet to address the question, several circuits have held that Hobbs Act extortion may be charged as a continuing offense and that the statute of limitations is no bar if the scheme continues into the five-year limitations period.  *See United States v. Forszt*, 655 F.2d 101, 104 (7th Cir. 1981) ("Hobbs Act extortion is also a continuing offense so that no statute of limitations problem exists where, as here, there is a single continuous plan of extortion embracing multiple payments over a period of years."); *United States v. Bucci*, 839 F.2d 825, 829–30 (1st Cir. 1988) (upholding Hobbs Act conviction where scheme began outside, but ended within, limitations period); *United States v. Provenzano*, 334 F.2d 678, 687 (3d Cir. 1964) (same).

Much like in *Forszt*, *Bucci*, and *Provenzano*, Tivest's payments to Burfoot were "the consummation of [an] extortionate scheme which was a single and unified one," *Provenzano*, 334 F.2d at 685, and the scheme stretched into the applicable five-year limitations period.  In fact, the district court specifically instructed the jury that, with respect to count four, "the government must prove beyond a reasonable doubt that at least one act which is a part of the offense occurred subsequent to January the 7th, 2011."  J.A.

15

4415. The jury found Burfoot committed an act in furtherance of the extortion scheme with Tivest after January 7, 2011, and thus appropriately convicted him of Hobbs Act extortion.

### ii. Constructive Amendment

Burfoot also argues that the district court's jury instructions constructively amended count four in violation of Burfoot's Fifth Amendment rights. The Fifth Amendment "guarantees that a criminal defendant will be tried only on charges in a grand jury indictment," so "only the grand jury may broaden or alter the charges." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (internal quotation marks omitted). A constructive amendment—also referred to as a fatal variance—occurs when the court "broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Floresca*, 38 F.3d 706, 710 (4th Cir. 1994). In other words, there's a constructive amendment when the indictment is effectively altered "to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *Randall*, 171 F.3d at 203 (internal quotation marks omitted).

Count four of the indictment alleges, in part, that Burfoot "obtained approximately $50,000 and other things of value." J.A. 61. During its deliberations, the jury asked, with respect to count four, whether it needed to find that Burfoot obtained $50,000 in cash in addition to something of value, or just that he obtained something of value and cash equating, in total, to $50,000. The district court first recounted the elements of the offense, but when the jury requested additional guidance, the court instructed as follows:

> [T]he Government must prove that the defendant received something of value. The Government does not have to prove what that amount of value was or doesn't have to quantify it. They have to prove that he received something of value.

J.A. 4656.

The court's clarifying instructions didn't constructively amend count four because obtaining a specific amount of money, like $50,000, isn't an element of Hobbs Act extortion—only "obtain[ing] a thing of value" is. J.A. 4417; *see also Evans v. United States*, 504 U.S. 255, 259–60, 260 n.4 (1992). Also, when an indictment charges an offense in the conjunctive, but either prong is a sufficient basis for conviction, a district court may instruct the jury in the disjunctive, telling it to return a guilty verdict if either prong is met. *See Robinson*, 627 F.3d at 958; *United States v. Perry*, 560 F.3d 246, 256 (4th Cir. 2009). We therefore reject Burfoot's argument.[*]

### 4. Insufficient Evidence of Perjury

Finally, Burfoot argues that the district court should have acquitted him of perjury because the government failed to prove that his false statements made under oath were material. A person is guilty of perjury under 18 U.S.C. § 1623 if he knowingly makes a false, material declaration under oath in a proceeding before any court of the United States. *United States v. Wilkinson*, 137 F.3d 214, 224 (4th Cir. 1998). A declaration is material "if it has a natural tendency to influence, or is capable of influencing" the judge or jury.

---

[*] Burfoot also argues that the district court's constructive amendment of count four justifies a new trial under Rule 33, but because there was no constructive amendment, this argument too fails.

*United States v. Littleton*, 76 F.3d 614, 618 (4th Cir. 1996). "It is irrelevant whether the false statement actually influenced or affected the decision-making process." *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998). Finally, "the jury, not the court, must decide the issue of materiality." *United States v. Gaudin*, 515 U.S. 506, 524 (1995).

At the *Woodard* trial, Burfoot denied ever asking Arney to give Sansbury $25,000 to purchase a condominium in exchange for favorable votes on the Norfolk City Council. He also denied ever soliciting or receiving anything of value in exchange for an official act. Burfoot alleges that these statements, even if false, weren't material to the trial because the *Woodard* indictment didn't allege Arney's exchange with Burfoot or Burfoot's other quid pro quo arrangements as part of a charged offense.

This argument holds no weight. First, the *Woodard* indictment charged the BOC executives with conspiracy to commit bank fraud, and Arney's exchange with Burfoot was evidence of this conspiracy. The government alleged that the conspiracy involved "troubled borrowers perform[ing] favors for Bank insiders in exchange for preferential treatment." *United States v. Woodard*, No. 2:12cr105, 2013 WL 4478065, at *2 (E.D. Va. Aug. 16, 2013). The Burfoot–Arney exchange was an example of Arney (a borrower) performing a favor for Sansbury (a Bank insider). "[T]he government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment." *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004).

Second, Burfoot's testimony contradicted Arney's testimony and thus could have influenced Arney's credibility as a witness. And because Arney was a key witness in the

18

*Woodard* trial, false declarations diminishing his credibility could have influenced the jury's decision. *See United States v. Friedhaber*, 856 F.2d 640, 642 (4th Cir. 1988) (holding testimony is material when it enhances or impeaches credibility of key witnesses). Thus, there was substantial evidence supporting Burfoot's perjury convictions.

B.

We turn now to Burfoot's contention that the district court erred in denying his Rule 33 motions for a new trial. Burfoot moved for a new trial based on (1) inadmissible testimony, (2) newly discovered evidence, and (3) the jury's failure to fully deliberate. Under Rule 33, a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A trial court "should exercise its discretion to award a new trial sparingly," and a jury verdict is not to be overturned except in the rare circumstance when the evidence "weighs heavily" against it. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (internal quotation marks omitted). We review a trial court's denial of a Rule 33 motion for an abuse of discretion. *Id.*

1. Inadmissible Testimony

Burfoot argues that the district court erred in denying his motion for a new trial based on the court's failure to grant a mistrial following City Councilman Tommy Smigiel's inadmissible opinion and hearsay testimony. At trial, on direct examination, the prosecution questioned Smigiel about Burfoot's corrupt relationship with local developer Boone. Smigiel testified:

> [T]here has always been a perception, since I have been on council, that
> Ronnie Boone and the Boone family have been able to get whatever they

want, and it doesn't matter that they aren't following the same rules as everybody else.

J.A. 2157. Burfoot's counsel immediately objected to the statement as inadmissible opinion and hearsay testimony and moved for a mistrial, or at least, a curative instruction.

The court denied the motion for a mistrial, but gave the following curative instruction:

> Ladies and gentlemen, a witness who does not qualify as an expert witness is not generally allowed to give opinions, and for somebody to say that his perception is that in this case that Ronnie Boone got special treatment, is not proper testimony because that's an opinion. So perception cannot be the basis for evidence that Boone got special treatment. That's just not competent evidence, and you should disregard it.

J.A. 2158–59.

We review a district court's evidentiary rulings for abuse of discretion, and such rulings are subject to harmless error review under Federal Rule of Criminal Procedure 52. *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997). Under Rule 52, any error that doesn't affect substantial rights is harmless and must be disregarded. *See United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995). An error is harmless if we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* (internal quotation marks omitted). Put another way, an error is harmless if it's "highly probable that [it] did not affect the judgment." *United States v. Nyman*, 649 F.2d 208, 212 (4th Cir. 1980) (internal quotation marks omitted). The decisive factors to consider are "the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Id.* (internal quotation marks omitted). Before granting

20

a mistrial, "the court should always consider whether the giving of a curative instruction or some alternative less drastic than a mistrial is appropriate." *United States v. Martin*, 756 F.2d 323, 328 (4th Cir. 1985).

Burfoot insists that Smigiel's inadmissible statement warranted a mistrial, but there's no reasonable possibility that Smigiel's testimony affected the jury's verdict. First, many local developers, including Boone himself, testified about their quid pro quo arrangements with Burfoot. Smigiel's remark about Boone was, at best, a drop in a bucket overflowing with evidence. Second, Burfoot's relationship with Boone didn't serve as an independent basis for any of the charges; it was primarily offered as Rule 404(b) evidence of other wrongs. Nor did the inadmissible statement impugn Burfoot's character or conduct. Finally, the district court properly mitigated any potential effects of Smigiel's statement by instructing the jury to disregard it. We therefore reject Burfoot's request for a new trial on this basis.

## 2. Newly Discovered Evidence

Next, Burfoot claims the district court should have granted his Rule 33 motion based on newly discovered evidence. To warrant a new trial on this ground, a defendant must demonstrate: (1) the evidence is newly discovered; (2) he has been diligent in uncovering it; (3) the evidence isn't merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) the evidence would probably produce an acquittal. *United States v. Lighty*, 616 F.3d 321, 374 (4th Cir. 2010).

Burfoot moved for a new trial based on two forms of "newly discovered evidence." First, he claims there's new evidence that Boone—a key government witness—suffers

from cognitive impairments that could have affected his memory of events and thus his competency as a witness. Burfoot relies on a transcript of Boone's sentencing hearing, at which Boone's counsel claimed that Boone had cognitive difficulties, had suffered a minor stroke, and was being evaluated for early onset dementia. Second, Burfoot says there's new evidence that a government witness, Paul Riddick, provided Dwight with a job and $100 when Dwight was released from prison. According to Burfoot, this new evidence demonstrates Riddick's bias towards Dwight and suggests that Riddick only testified to buttress Dwight's false testimony against Burfoot.

The district court denied Burfoot's Rule 33 motion because the new evidence was merely cumulative and impeaching, immaterial to the issues at trial, and wouldn't result in an acquittal. The court explained that it didn't perceive Boone to be suffering from any cognitive deficit when he testified against Burfoot. It also noted that the defense had ample opportunity to impeach Boone based on his poor memory, and did, in fact, exhaustively probe Boone's recollection. Furthermore, the court reasoned there was nothing new to be learned from Riddick supporting Dwight upon his release from prison, for it was well known at the time of the trial that Riddick and Dwight were allies.

Finally, the district court concluded that even if this new evidence was accepted as true, it wouldn't change the verdict because there was an "overwhelming amount of witness testimony and exhibits that corroborated beyond a reasonable doubt that [Burfoot] engaged in a quid-pro-quo scheme to trade political influence and votes for favors, cash, and other items of value." J.A. 7512. We agree with the district court's analysis and find no abuse of discretion in its judgment.

22

### 3. Jury's Failure to Fully Deliberate

Finally, Burfoot argues that the jury didn't fully deliberate or follow the instructions to "consider all the evidence in the case" because it deliberated for only four hours and forty-nine minutes. But juries are presumed to follow the judge's instructions, including the instruction to fully deliberate. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987). And the mere length of a jury's deliberation doesn't refute that presumption. *See United States v. Aguilera*, 625 F.3d 482, 487 (8th Cir. 2010) ("[B]rief jury deliberation alone is not a sufficient basis for a new trial."); *Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999) ("A jury is not required to deliberate for any set length of time. Brief deliberation, by itself, does not show that the jury failed to give full, conscientious or impartial consideration to the evidence."); *United States v. Cunningham*, 108 F.3d 120, 123–24 (7th Cir. 1997) ("But the time it takes the jury to decide is not the relevant factor. The weight of the evidence is."); *Guaranty Serv. Corp. v. Am. Employers' Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990) ("If the evidence is sufficient to support the verdict, the length of time the jury deliberates is immaterial."); *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 182 (1st Cir. 1988) (same); *Wall v. United States*, 384 F.2d 758, 762 (10th Cir. 1967) (same).

The jury here deliberated for nearly five hours and acquitted Burfoot on two counts. Nothing suggests it rubber-stamped the prosecution's case. Thus, the district court was right to deny Burfoot's motion for a new trial based on the length of the jury's deliberations.

## III.

For the reasons given, the district court's judgment is

*AFFIRMED.*