**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-4610

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

BRANDON D'ANGELO CHAVIS,

Defendant – Appellant.

No. 23-4614

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MELISSA E. BEASLEY,

Defendant – Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. Elizabeth W. Hanes, District Judge. (2:22-cr-00083-EWH-DEM-1; 2:22-cr-00083-EWH-DEM-2)

Argued: March 18, 2025                    Decided: July 31, 2025

Before DIAZ, Chief Judge, and WYNN and BENJAMIN, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Benjamin wrote the opinion in which Chief Judge Diaz and Judge Wynn joined.

_____

**ARGUED:** Emily Deck Harrill, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbia, South Carolina; Lawrence H. Woodward, Jr., RULOFF, SWAIN, HADDAD, MORECOCK, TALBERT & WOODWARD, P.C., Virginia Beach, Virginia, for Appellants.  Samantha Claire Bensinger, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Jessica D. Aber, United States Attorney, Richmond, Virginia, Joseph E. DePadilla, Assistant United States Attorney, Graham M. Stolle, Special Assistant United States Attorney, Norfolk, Virginia, Vetan Kapoor, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

DEANDREA GIST BENJAMIN, Circuit Judge:

Brandon Chavis and Melissa Beasley appeal their convictions related to a spree of armed robberies. Chavis also challenges the admission of certain expert evidence and an alleged prejudicial variance between the original and superseding indictment. Finding no error, we affirm.

I.

By superseding indictment, the Government charged Chavis and Beasley with conspiracy to commit Hobbs Act robbery, 18 U.S.C. § 1951(a); five counts of Hobbs Act robbery, 18 U.S.C. § 1951(a); and five related counts of using or brandishing a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii). J.A. 161–70.[1] We begin by describing some of the evidence adduced at trial against Chavis and Beasley. This evidence included surveillance footage, cellphone data, eyewitness testimony, and physical evidence the police recovered.

A.

In late 2021, a string of armed robberies targeting mostly convenience stores occurred in and around Norfolk, Virginia. The crime wave began on October 11, 2021, when the Redgate Avenue 7-Eleven was robbed. Employee Eugene Stevenson was working the cash register that evening and saw a man enter wearing an orange reflective vest, a black hoodie, and a mask. The man carried a gun and told Stevenson to give him

---

[1] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers refer to the "J.A. #" pagination.

money from the register. Stevenson complied, and the robber stole about $150. Cameras recorded the robbery, and footage shows the robber wore an orange reflective vest, a black hoodie, and black gloves. The footage also shows the robber brandishing a black gun in his right hand and carrying a bag in his left. Stevenson testified that after the robber left the store, Stevenson followed him outside and saw the robber get into a gray Volvo SUV with a female driver. On appeal, Beasley admits that "[t]here was evidence that Ms. Beasley's car [a Volvo SUV] was seen at or near some of the locations of the robberies near the time of the robberies." Beasley's Br. at 9.[2]

On October 13, 2021, the Hampton Boulevard Subway was robbed. Cameras recorded the robbery. The robber wore an inside-out black hoodie, a black mask, and black gloves. The robber brandished a gun with a yellow mark on its barrel in his right hand and carried a black bag in his left hand. The robber stole about $500.

On October 24, 2021, a robbery was attempted on the Airline Boulevard Subway. Cameras recorded the incident. The would-be robber wore a black, inside-out hoodie and a black mask. He brandished a firearm in his right hand and carried a black bag in his left. Because the employees had fled, he could not open the cash register. Surveillance footage shows a dark-colored Volvo SUV behind the Subway during the incident.

On October 25, 2021, three robberies occurred. First, the Indian River Road 7-Eleven was robbed. Cameras recorded the robbery. The robber wore an orange reflective vest, a black hoodie, a black mask, and black gloves. He carried a black gun in his right

---

[2] Citations to the parties' briefs refer to the ECF header at the top of each page.

hand and a black bag in his left.  The robber stole $180.  The car wash next to the 7-Eleven had surveillance cameras.  Just before the robbery, footage shows a man in an orange reflective vest exiting a dark SUV.  After the robbery, the SUV left the rear of the 7-Eleven. Upon reviewing this footage, police believed the Volvo SUV was tied to the robber.

Second, the Providence Road 7-Eleven was robbed.  Cameras recorded the robbery. The robber wore an orange reflective vest, a black hoodie, and black gloves.  He brandished a gun in his right hand.  The robber stole $400.

Third, the Colley Avenue 7-Eleven was robbed.  Deshawn Charity, the assistant manager working that evening, testified that the robber was a man whose face was covered and who wore an orange reflective vest and an "all black outfit."  J.A. 567.  The robber had a bag in his left hand and a gun in his right, which he pointed at Charity's head.  The robber took about $120.

Before trial, Charity reviewed photos from some of the other robberies.  At trial, he compared the robbery he witnessed to videos and photos from the Redgate, Indian River, and Providence Road 7-Eleven robberies.  Charity testified that the outfit the robber wore, the gun he used, his appearance, and how he walked into the store all looked similar to those attributes of the Colley Avenue 7-Eleven robber.

On October 26, 2021, the Princess Anne Road 7-Eleven was robbed.  When the robber entered the store, the store's manager was in the back office.  He testified that his video monitor showed a man wearing a black mask and orange reflective vest walk in.  An employee soon ran into the office, locked the door, and said that the man had "just put a fucking gun in [his] face and robbed the store."  J.A. 516.  Cameras recorded the robbery.

5

Footage shows the robber cleaning out the cash register and putting money inside a black bag.

Later that same evening, the Azalea Garden Road 7-Eleven was robbed. Kristine Renfroe was working the cash register. She testified that a man with a gun came in and demanded money. He "w[ore] a black hoodie with a black ski mask and an orange work vest." J.A. 578. Renfroe and a colleague put money in the robber's bag. The robber stole about $170. Cameras recorded the robbery, and footage shows the robber brandishing a firearm and wearing the clothing Renfroe testified to.

On October 27, 2021, the Independence Boulevard Subway was robbed. Cameras recorded the robbery. The robber wore a black mask, orange reflective vest, black hoodie, and black gloves. He brandished a gun in his right hand. The robber stole $237.

The McDonalds behind the Subway had perimeter surveillance cameras. Footage shows a dark-colored SUV drive through the McDonald's parking lot. The SUV then pulled into the parking lot behind the Subway. A man wearing an orange vest got out of the passenger side of the SUV and stood in the door well for about 90 seconds. He then walked toward the Subway. After the robbery, the man returned to the SUV, and the vehicle drove away. When the SUV was gone, a puddle was visible on the ground near where the man had been standing. Before the SUV had pulled into the lot, the puddle was not there. Police collected a sample of the liquid and sent it to the Virginia Department of Forensic Science for DNA analysis.

On October 28, 2021, a Speedway convenience store was robbed. Cameras recorded the robbery. The robber wore a black hoodie, black mask, black gloves, and an

6

orange reflective vest. The robber brandished a gun at the store clerk and stole both money ($130) and lottery tickets. The robber ran back to an SUV parked behind the Speedway and the vehicle took off. One of the lottery tickets was a winning ticket worth $200.

Thirty minutes later, surveillance footage from a nearby Exxon gas station shows Beasley redeeming the stolen lottery ticket. At trial, Beasley's counsel conceded Beasley redeemed the ticket. J.A. 704 ("I've told the jury she cashed that ticket."). A state investigator traced the lottery ticket and testified that it had been stolen from the Speedway.

Later that same day, two other attempted robberies occurred. The first was at a 7-Eleven on Battlefield Boulevard. Cameras recorded the robbery. The would-be robber wore black clothing, a black mask, and an orange reflective vest. He carried a gun in his right hand and a black bag in his left. When the would-be robber learned that there was only $20 in each register, he left without taking any money.

Finally, a man attempted to rob the J. Clyde Morris Boulevard Subway. Cameras recorded the attempted robbery. The would-be robber wore a black hoodie, a black mask, black gloves, and an orange reflective vest. He brandished a gun in his right hand and had a black pouch. He pointed the gun at the store's cashier and demanded money. The cashier fled and the would-be robber did not recover any money.[3]

---

[3] Beasley and Chavis were indicted for the Redgate, Indian River, Providence Road, Princess Anne, and Independence Boulevard robberies. Chavis and Beasley were not indicted for the other crimes described herein. At trial, the Government offered and the district court admitted evidence of these non-indicted crimes to show the existence of a conspiracy, a modus operandi, and the robber's distinctive clothes and handgun. On appeal, neither Chavis nor Beasley challenge the admission of evidence of the non-charged crimes.

That same evening, Detective Eric Strano of the Hampton Police Department received a report of a robbery. The police were looking for "a black male, wearing all dark clothing" who robbed a store and used "a black Volvo SUV with a temporary tag and no front tag to do so." J.A. 724.

Strano "saw a dark in color Volvo SUV parked at a 7-Eleven." J.A. 725. The Volvo had a temporary tag. Strano believed the car matched the description of the SUV that was involved in the robbery. As he neared the SUV, Strano saw "a black male wearing an orange traffic vest and dark clothing" approach the car. J.A. 725. The man got in the car, and the Volvo left the parking lot.

Strano followed the Volvo for a while but then drove past it when it pulled into a church parking lot. About five minutes later, Strano drove back to the 7-Eleven and saw that the Volvo had returned. He saw a woman standing next to the car talking on her phone, and a man in the driver's seat. Strano approached the Volvo and spoke to the pair. At trial, Strano identified the woman as Beasley and the man as Chavis. Strano testified that he believed Chavis was the man he had seen wearing the orange reflective vest and approaching the Volvo SUV before it left the 7-Eleven. Chavis was wearing his hoodie inside-out when Strano spoke to him. Strano did not think he had enough information to arrest the couple that night.

A few weeks later, Beasley called the police to report that Chavis had a gun. J.A. 1278 (parties' stipulation that the "call for service on November 15, 2021, was Ms. Beasley calling Norfolk Police Department reporting Mr. Chavis had a gun"). Officer Gino

8

Haywood responded and found Beasley near a gray Volvo SUV with temporary tags. Beasley told Haywood the car was hers.

Beasley pointed Chavis out to Haywood. Chavis was about 50 to 100 yards away. Chavis made eye contact with Haywood but Chavis continued to walk away. Chavis left Haywood's line of sight for a few moments, but then reappeared, walking toward Haywood. Haywood instructed Chavis to stand with Haywood's partner, who was with Beasley. Haywood then went to investigate the area where he had momentarily lost sight of Chavis. Under a tire of a parked car, Haywood found a loaded, black .9mm Hi-Point firearm. Both Chavis and Beasley were arrested. At trial, Haywood was shown photos, which he confirmed depicted the firearm he recovered. The photos show a pistol with a yellow strip on its barrel.

At trial, detective Keeley Flanagan testified that she had compared the gun Haywood recovered with the gun the robber brandished during the robberies. She testified that both guns had an ejection port that was "rounded in the front and squared in the back." J.A. 1102. She testified that the angle of the rear slide on both guns was 45 degrees and that both had paint missing on the front barrel. She also noted that both guns had a distinctive yellow mark on their front sight.

Returning to Chavis' and Beasley's arrest, the police searched and recovered evidence from Beasley's Volvo SUV. The police found mobile phones, brown boots, and a black durag. During Strano's encounter with Beasley and Chavis, he observed Chavis wearing brown boots. The police also found a black and maroon jacket. This jacket

9

resembled a jacket that Beasley wore when she cashed the stolen lottery ticket and when Strano encountered her.

The police analyzed data from the mobile phones recovered. Chavis and Beasley admitted that their respective phone numbers were associated with these phones. *See* J.A. 973–74. As to the phone associated with Beasley's number, forensic examination revealed that data from the "whole month of October was deleted." J.A. 1062. Nevertheless, cache data allowed the police to recover pictures stored on the cellphone. These included several pictures of Subways, including a photo of the Airline Boulevard Subway taken the day it was robbed. The cache data further revealed that the phone had accessed news stories about the 7-Eleven robberies on both October 27 and 28. One article described the armed robbery at the Indian River Road 7-Eleven.

The police also examined text messages exchanged between the phones. On the phone associated with Chavis' number, Beasley's name was saved as "wifey." J.A. 1104. On October 25, at 7:57 p.m., Chavis texted Beasley that "Its almost time to move baby wya." J.A. 1104–05; J.A. 1104 (Flanagan testimony that in her experience "wya" means "where you at?"). Four minutes later, Beasley replied, saying "pulling up." J.A. 1105. Beginning about two hours later, the Indian River Road, Providence Road, and Colley Avenue 7-Elevens were all robbed.

Jason Dufault, with the FBI's Cellular Analysis Survey Team, testified about the phones' call detail records ("CDR data").[4] Dufault testified that the phone associated with

---

[4] CDR data provides information about the cell towers a phone interacts with when a call is made, when a text is sent, or when the phone is used for a data session. J.A. 992.

10

Beasley's number was in the general area of the Redgate 7-Eleven about five minutes before it was robbed; that the phone associated with Beasley's number was in the general area of the Indian River Road 7-Eleven around the time it was robbed; that the phones associated with Chavis' and Beasley's numbers were in the general area of the Providence Road 7-Eleven about 15 minutes before the store was robbed; that the phones associated with Chavis' and Beasley's numbers were communicating with each other and were in the general area of the Princess Anne Road 7-Eleven around the time the store was robbed; that the phones associated with Chavis' and Beasley's numbers were in the general area of the Azalea Garden Road 7-Eleven, Independence Boulevard Subway, and Speedway robberies when those incidents occurred; that neither phone interacted with any cell tower other than the one in the general area of the Redgate 7-Eleven during that robbery; and that during the robberies that occurred between October 25 and October 28, neither phone interacted with any cell tower other than those near the stores that were robbed. Dufault therefore "conclude[d] that [the phones] were in the general area" of the robberies when they happened. *See* J.A. 1040.

By warrant, the Government obtained a sample of Chavis' DNA. The police sent Chavis' DNA and the sample collected at the Independence Boulevard Subway robbery to the Virginia Department of Forensic Science for analysis. Dr. Lashanda Oglesby developed a DNA profile from Chavis' sample and then compared it to the DNA collected from the Subway robbery.

Oglesby opined that the Independence Boulevard Subway sample "appear[ed] to be a single-source profile," meaning that the DNA appeared to come from only one person.

11

J.A. 788.  But Oglesby "was not able to make any conclusions or any comparisons" between the Subway sample and Chavis' DNA, J.A. 783, so she electronically transferred the data to another department examiner, Dr. Lisa Schiermeier-Wood, J.A. 788.

Schiermeier-Wood then used TrueAllele, a probabilistic genotyping software, to analyze the DNA data.  TrueAllele computes a "likelihood ratio," which is a statistic that compares the probability that a DNA sample matches the DNA of a specific person to the probability that the sample matches the DNA of a random person.  J.A. 932.  Based on the software's analysis, Schiermeier-Wood opined that Chavis "cannot be eliminated as a contributor" of the DNA collected at the site of the Independence Boulevard Subway robbery.  J.A. 932.  TrueAllele determined that a match between Chavis' sample and the sample collected from the Subway robbery was "33 trillion times more probable than a coincidental match to an unrelated African-American person," "1.8 quadrillion times more probable than a coincidental match to an unrelated Hispanic person," and "26 quadrillion times more probable than a coincidental match to an unrelated Caucasian person."  J.A. 932–33.

## B.

The district court conducted a five-day jury trial.  The jury convicted Chavis on all counts and Beasley on all but two counts—for the Redgate 7-Eleven robbery, the jury acquitted Beasley of Hobbs Act robbery and the related use of a firearm count.  Both during and after trial, Chavis and Beasley moved for judgments of acquittal under Fed. R. Crim. P. 29.  The district court denied the motions.  Both Chavis and Beasley appealed, and we have jurisdiction.  28 U.S.C. § 1291; 18 U.S.C. § 3742.

12

II.

Chavis first argues that the district court abused its discretion in admitting Schiermeier-Wood's testimony.  Chavis argues that, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Fed. R. Evid. 702, Schiermeier-Wood's testimony was not reliable.  Chavis argues that TrueAllele is not reliable because Schiermeier-Wood did not evaluate its "source code."[5]  Chavis' Br. at 21.  Chavis continues that because Schiermeier-Wood did not personally verify that TrueAllele's source code "functions correctly, including any [artificial intelligence] element," the Government did not establish that TrueAllele's results are the product of a reliable methodology. *Id.* at 26; *see also id.* at 27 ("Without access to TrueAllele's source coding, there is no way to know whether the software is correctly implementing the statistical modeling.").

For its part, the Government argues that Schiermeier-Wood's testimony was properly admitted.  The Government contends it presented substantial evidence that TrueAllele is reliable, and that Schiermeier-Wood reliably applied the program to the DNA data at hand.  This evidence included testimony about validation studies on TrueAllele; testimony about internal and external testing by the Virginia Department of Forensic Science demonstrating that TrueAllele is reliable; and testimony about peer reviewed articles attesting to TrueAllele's reliability.  *See, e.g.*, J.A. 378 ("The company, for

---

[5] "Source code" is the "nonmachine language used by a computer programmer to create a program." *Source Code*, Black's Law Dictionary (12th ed. 2014).

13

validation there is what's called internal validation, and that is validation that we at the [Virginia Department of Forensic Science] undertook. Prior to us doing internal validation, [TrueAllele] had already done what's called developmental validation where they published in peer reviewed journals the mathematics, the methods, the different computer algorithms. They have published those in peer reviewed journals.").

We decline to address the merits of Chavis' expert challenge because this argument was not preserved. "The rule is well settled that only in exceptional cases will questions, of whatever nature, not raised and properly preserved for review in the trial court, be noticed on appeal." *United States v. Maxton*, 940 F.2d 103, 105 (4th Cir. 1991) (quoting *Hutchinson v. Fid. Inv. Ass'n*, 106 F.2d 431, 436 (4th Cir. 1939)); *see also United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014) ("To preserve an argument on appeal, the defendant must object on the same basis below as he contends is error on appeal."). Neither at Schiermeier-Wood's *Daubert* hearing nor at trial did Chavis object that Schiermeier-Wood's testimony was unreliable because she had not reviewed TrueAllele's source code.[6] *See, e.g.*, *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) ("As this court has repeatedly held, issues raised for the first time on appeal generally will not be

---

[6] During Schiermeier-Wood's *Daubert* hearing, Chavis' counsel cross-examined Schiermeier-Wood but never asked her about TrueAllele's source code. Chavis' counsel asked Schiermeier-Wood if she knew what TrueAllele was "actually doing" when it calculated its results. *See* J.A. 400. Schiermeier-Wood responded that she was not a "computer scientist and . . . d[id] not know code." *See* J.A. 400. Chavis' counsel did not further pursue this line of questioning.

At trial, on cross-examination, Chavis' counsel asked Schiermeier-Wood if she had seen TrueAllele's source code. J.A. 960. Schiermeier-Wood testified that she had not. Again, Chavis' counsel did not develop this line of questioning or argue that Schiermeier-Wood's failure to review TrueAllele's source code rendered her testimony unreliable.

14

considered."). Accordingly, this argument is not properly before us, and we decline to address it.

We now turn to Chavis' argument that the evidence against him was insufficient to support his conviction.

## III.

### A.

#### i.

"A defendant challenging the sufficiency of the evidence to support his conviction bears 'a heavy burden.'" *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (quoting *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir.), *cert. denied*, 516 U.S. 935 (1995)). In reviewing the sufficiency of evidence supporting a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The appellate court must "allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982) (citations omitted). A jury's verdict must be upheld "if there is substantial evidence, viewed in the light most favorable to the Government," to support it. *Burks v. United States*, 437 U.S. 1, 17 (1978) (noting that reversal for insufficient evidence is reserved for the rare case "where the prosecution's failure is clear"); *see also United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (noting that an appellate court "may

15

not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable").

## ii.

A conviction for Hobbs Act robbery requires proving two elements: the underlying robbery and an effect on interstate commerce. *United States v. Williams*, 342 F.3d 350, 353 (4th Cir. 2003). A conviction under 18 U.S.C. § 924(c) requires showing that a firearm was possessed, brandished, or discharged during a crime of violence. *See United States v. Mathis*, 932 F.3d 242, 263 (4th Cir. 2019). Chavis acknowledges that the robberies he was charged with occurred and affected interstate commerce. Chavis also acknowledges that Hobbs Act robbery qualifies as a crime of violence. Chavis disputes, however, the jury's verdict that *he* was the robber.

The gist of Chavis' argument is that: (1) the evidence presented at trial was only circumstantial; and (2) no robbery witness positively identified Chavis in open court. But reading all facts in a light most favorable to the Government, the evidence establishing Chavis' guilt was crushing.

To start, a conviction can stand on circumstantial evidence alone. *See United States v. Osborne*, 514 F.3d 377, 387 (4th Cir. 2008) ("[C]ircumstantial evidence . . . may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence.") (quoting *United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir. 1989)). And there is no requirement that a witness to a crime "physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime." *United States v. Taylor*, 900

16

F.2d 779, 782 (4th Cir. 1990) (citations omitted). With that aside, we briefly note some of the strongest evidence—and related inferences—that support Chavis' convictions.

We begin with the CDR data. As stated above, Chavis and Beasley admitted that their phone numbers were associated with the cellphones recovered from Beasley's Volvo. Given this fact, a reasonable juror could conclude that the cellphone associated with Chavis' number was his and that the cellphone associated with Beasley's number was hers. A reasonable juror could also infer, given Dufault's testimony, that Chavis was present at the scene of each charged robbery—an immensely powerful fact. *See* J.A. 1040 ("conclud[ing] that [the phones] were in the general area" of the robberies when they happened).

But, contrary to what Chavis would have us believe, the evidence did not stop there. Physical evidence and eyewitness testimony tied Chavis to the crimes. Beasley called the police to report that Chavis *had a gun*. And Haywood recovered a gun that a reasonable juror could assume was Chavis'. A reasonable juror could further infer, based on Flanagan's testimony, that this was the weapon used during the robberies—the gun recovered was physically distinctive and included, amongst other things, a telltale yellow mark on its front sight. *See* Chavis' Br. at 19 (admitting "[t]he recovered weapon had certain characteristics which appear to match the weapon used during the robberies").

Further, similarities in the clothing the robber and Chavis wore support Chavis' convictions. On the evening of the Speedway robbery, Strano saw Chavis in Beasley's Volvo wearing an "orange traffic vest and dark clothing." J.A. 725. These clothes were identical to those that the robber wore in surveillance footage from the Speedway robbery,

17

as well as the clothing the robber wore in the surveillance videos from nearly every other attempted or completed robbery. Brown boots were recovered from Beasley's car after the pair's arrest, and the robber had worn brown boots. The robber generally wore his black sweatshirt inside-out, and when Strano interacted with Chavis, the sweatshirt Chavis was wearing was inside-out.

Further, at trial, Colley Avenue 7-Eleven employee Charity compared the robbery he personally witnessed to videos and photos from the Redgate, Indian River, and Providence Road 7-Eleven robberies. Charity testified that the outfit the robber wore, the gun he used, his appearance, and his gait upon entering the store were similar to those of the robber who stole money from the Colley Avenue 7-Eleven.

The above evidence and the inferences that it permits were clearly sufficient to allow the jury to find Chavis guilty of the charged counts. It placed Chavis at each crime scene in possession of the gun police recovered—a gun that Beasley specifically accused Chavis of possessing.

The jury was certainly entitled to believe Chavis' version of the events. That, for example, though his phone was located near each robbery, *he* didn't "possess[] the phone[]" himself when each robbery occurred. Chavis' Br. at 18. The jury, however, was likewise free to disregard the argument—which it clearly did. In sum, the evidence the Government presented was more than sufficient to establish Chavis' guilt.[7]

---

[7] As this analysis shows, even without Schiermeier-Wood's testimony, the evidence against Chavis was more than sufficient to support the jury's guilty verdict. Thus, a harmless error analysis regarding admission of the DNA evidence—which we do not (Continued)

B.

Last, Chavis argues his convictions for Hobbs Act robbery should be dismissed because there was an improper variance between the superseding indictment and the crimes he was convicted of at trial. The cover page of the superseding indictment reads that Chavis was charged with "Interference and *Attempted Interference* with Commerce by Robbery"—namely, both completed and attempted Hobbs Act robbery. *See* J.A. 161 (emphasis added). The superseding indictment's body text, however, only charges Chavis with completed Hobbs Act robbery. *See* J.A. 165–70. At trial, the verdict form concerned only completed Hobbs Act Robbery. J.A. 1333–37.

The Fifth Amendment right to indictment by grand jury is violated when the proof at trial "permits a jury to convict a defendant for a different offense than that for which he was indicted." *United States v. Redd*, 161 F.3d 793, 795 (4th Cir. 1998). A fatal variance, or a constructive amendment, occurs "when the indictment is effectively altered 'to change the elements of the offense charged, such that a defendant is actually convicted of a crime other than that charged in the indictment.' " *United States v. Banks*, 29 F.4th 168, 174 (4th Cir. 2022) (quoting *United States v. Burfoot*, 899 F.3d 326, 338 (4th Cir. 2018)). But not all variances are fatal. *Redd*, 161 F.3d at 795. Rather, a variance "violates a defendant's rights only if it prejudices him." *Id.*

---

reach—would likely not help Chavis. *See United States v. Jenkins*, No. 21-4447, 2024 WL 4891180, at *5 (4th Cir. Nov. 26, 2024), *cert. denied*, No. 24-6886, 2025 WL 1211849 (U.S. Apr. 28, 2025) (finding admission of defendant's two-hour videotaped confession harmless and affirming life sentence on human trafficking conviction where evidence was "one-sided," and co-conspirator testified against defendant).

19

We find no prejudicial variance.  The superseding indictment's body text charged Chavis with completed Hobbs Act robbery—exactly what he was tried and convicted for. Chavis' argument on this point is therefore meritless.

*            *            *

For the above reasons, we affirm Chavis' convictions.

IV.

Like Chavis, Beasley argues that the evidence adduced at trial was insufficient as a matter of law to prove her guilty beyond a reasonable doubt.  To Beasley, "[t]he evidence against [her] was a series of random events that do not reach the standard of proof beyond a reasonable doubt and none of which are really proof of any crime."  Beasley's Br. at 9. Under the deferential standard we apply to her challenge, however, this contention is unconvincing.

A mountain of evidence established Beasley's guilt.  Beasley admitted she cashed a lottery ticket stolen during the Speedway robbery.  A reasonable jury could use this fact to connect her to the robber, who often fled in *her* Volvo SUV.  *See id.* (admitting that "[t]here was evidence that Ms. Beasley's car [the Volvo SUV] was seen at or near some of the locations of the robberies near the time of the robberies").  Further, a reasonable jury was free to assume that the cellphone associated with Beasley's number was hers.  And once it did, Beasley's guilt became evident.

The data on Beasley's phone had been deleted for the entire month of October.  A reasonable jury could assume Beasley had something to hide, an assumption that the CDR

20

data bolstered. Namely, the CDR data showed Beasley, time and again, at the scenes of the crimes. The data also suggested that she communicated with Chavis around the times of the robberies. And to make matters worse, Beasley's phone contained a photo of the Airline Boulevard Subway taken the day it was the target of an attempted robbery.

Maybe, as Beasley argues, all this evidence "proved nothing" about where Beasley was or what she was doing during the charged robberies. *Id.* Maybe, as Beasley contends, *she* wasn't driving her Volvo SUV when it was seen at or near "the locations of the robberies near the time of the robberies." *Id.* Or maybe, even if Beasley was driving on the evenings in question, she wasn't "aware of what the passengers in her car were doing." *Id.* These arguments, however, were for the jury to weigh, and fail to address "the relevant [legal] question [on appeal which] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. *This* question's answer is clearly yes.

Accordingly, we affirm Beasley's convictions.

V.

For the reasons stated above, we affirm Chavis' and Beasley's respective convictions.

*AFFIRMED*

21