Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge HARRIS joined. Senior Judge DAVIS wrote a separate opinion concurring in part and dissenting in part.
NIEMEYER, Circuit Judge:
A jury convicted Jean Paul Alvarado of knowingly and intentionally - distributing heroin to Eric Thomas on March 29, 2011, with Thomas’ death resulting from the use of the heroin so distributed, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The district court sentenced Alvarado to the mandatory minimum sentence of 20 years’ imprisonment.
On appeal, Alvarado contends that the district court erred (1) in failing to clarify for the jury that the results-in-death element meant that the jury could not convict him of the charged offense if heroin was only a contributing cause of death; (2) in failing to instruct the jury that'Alvarado must have “reasonably foreseen” that death could result; and (3) in admitting hearsay testimony that Thomas said he purchased heroin from “Fat Boy,” meaning Alvarado, in violation of the hearsay rule and the Sixth Amendment’s Confrontation Clause.
We affirm. First, we conclude that, because there was no evidence in the record that Thomas could have died without the heroin, the jury’s verdict was necessarily consistent with the Supreme Court’s requirement of but-for causation. See Burrage v. United States, — U.S. —, 134 S.Ct. 881, 887-88, 187 L.Ed.2d 715 (2014). As a result, the district court’s decision not to elaborate on the meaning of the statutory results-in-death language did not amount to an abuse of discretion, let alone plain error, in light of the court’s legitimate concerns about confusing the jury. Second, we conclude that our decision in United States v. Patterson, 38 F.3d 139 (4th Cir.1994), forecloses Alvarado’s argument that the district court should have instructed the jury on the foreseeability of death. And finally, we conclude that the district court did not commit reversible error in admitting hearsay testimony that Thomas said he purchased heroin from “Fat Boy” because (1) even if the hearsay did not fall under a hearsay exception, its admission was harmless; and (2) the hearsay was not “testimonial” and , therefore did not implicate Alvarado’s Sixth Amendment right of confrontation.
I
In response to custodial police questioning on March 30, 2011, Alvarado admitted that, on the previous day, March 29, he had sold five bags of heroin to Thomas. Text messages between Alvarado and Thomas, indicated that the sale occurred during the late morning hours in the bathroom of a grocery store in Harrisonburg, Virginia. Within hours of that transaction, when Thomas’ fiancée, Monica Shaughnes-sy, returned to the apartment in which she and Thomas were living, she discovered Thomas slumped over in a chair. As she testified at trial, “As soon as I opened the door, I knew what was going on.... I knew he had overdosed on a mixture of Xanax and heroin. He had an amazing amount of Xanax and I knew he was going to get heroin that day. His new thing was to mix them together and that will kill you *245 and he knew this.” When she touched Thomas, she found that “[h]e was freezing.” She said she had “[n]ever felt a human cold like that.” ,
When Shaughnessy was unable to revive Thomas with CPR, she called 911, a call that was received by the dispatcher at 3:13 p.m. Emergency responders could not resuscitate Thomas, and at 4:0.7 p.m., he was pronounced dead at a local hospital. When investigators arrived at Thomas’ apartment within an hour of the emergency 911 call, they observed an array of drug paraphernalia around where Thomas had been sitting, including needles, needle caps, and drug packaging materials. They also discovered a cell phone, which led them to Alvarado, who was arrested the next day.
A grand jury indicted Alvarado for heroin distribution resulting in death, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).
Prior to trial, Alvarado filed a motion in limine to exclude evidence of statements made by Thomas, including statements by which Thomas told friends that he chiefly bought heroin from a drug dealer named “Fat Boy,” referring to Alvarado. The district court deferred resolution of'the motion until trial and at that time admitted the statements.
At trial, a former DEA special agent, who had investigated Thomas’ death, testified that Thomas’ and Alvarado’s cell phone records revealed that Thomas had made contact with Alvarado and a man named Luis Blass, another drug dealer, in the days and weeks before his death. The investigator testified that Thomas’ last contact with Blass occurred on March 24, 2011—five days before- Thomas’ death. Thomas communicated with Alvarado, however, with text messages on March 26, 27, 28, and 29. In two text messages, one on March 27 and one on March 29 (at 10:40 a.m.), Thomas wrote that he wanted a “b” from Alvarado (referring to a “bundle” of heroin bags wrapped together). In further messages on March 29, Thomas and Alvarado arranged plans to meet in the bathroom of a grocery store, and, in the final text, Thomas confirmed to Alvarado that he had seen him and was-walking into the bathroom.
Thomas’ fiancée Shaughnessy testified that Thomas had begun using heroin in the summer of 2009 and that he had progressed to daily use by early 2010. She stated that Thomas used his entire daily purchase of heroin, usually a bundle of five bags and sometimes more, “[p]retty much within an hour span” of consummating the purchase. While Thomas would often share some heroin, with Shaughnessy, he would consume the remainder almost immediately. She also testified that, on the day of his death, Thomas had driven her to work in the morning and had -indicated to her that he intended to buy heroin soon thereafter before going to play golf. “[H]e had to go get heroin because he wasn’t going to be able to [play golf] without that.” She stated that she knew that Thomas purchased heroin from a dealer named “Fat Boy,” because he said so and because she often went with Thomas (about once a week) when he purchased heroin from “Fat Boy,” referring to Alvarado. Shaughnessy also said that Alvarado sold Thomas heroin in white-colored bags.
Josh Melewski) one of- Thomas’ best friends, also testified that Thomas did not stockpile heroin, but would- instead use it almost immediately after purchasing it. Recounting Thomas’ suppliers over the years,' Melewski said that Thomas first obtained heroin in 2009 from a man named Miguel Rodriguez. After' Rodriguez, he purchased heroin from a man named Luis, who sold Thomas heroin in square-shaped, blue-colored bags that had a stamp on *246 them. Melewski also testified that, beginning in 2010, Thomas started purchasing from a dealer that Thomas referred-to. as “Fat Boy,” Melewski stated that “Fat Boy” sold heroin in “[p]lain bags with no stamp.”
On the day after Thomas’ death, Melew-ski met with Shaughnessy at a hotel, where Shaughnessy took Melewski into a bathroom and showed him bags of heroin she had purportedly taken from their apartment on the day of the overdose. Melewski said that, the bags that Shaugh-nessy produced “were the rectangle, clear, wax bags.”
A forensic toxicologist with the Virginia Department of Forensic Science, Dr. David Burrows, testified that a drug screen of- Thomas’ blood and urine- revealed the presence of-a high concentration of morphine, which, he explained, was the metabolized form of heroin. The drug screen also revealed*a “therapeutic level” of Xanax—ia, an amount, that a physician would recommend to treat a specific condition—and an amount of Benadryl that was “below the associated toxic level.” Dr. Burrows acknowledged that Benadryl could “aggravate” the effects of heroin and that the combination of heroin, Benadryl, and Xanax- could have “synergistic effects.” He did not, however, give-an opinion on the role that each of the drugs played in Thomas’ death.
Virginia’s Assistant Chief Medical Examiner; Dr, Gayle Suzuki, performed the autopsy on Thomas, and, at-trial, she gave her opinion as to the cause of death. She concluded that Thomas- died of “heroin intoxication.” While Dr. Suzuki acknowledged that Thomas also had Xanax and Benadryl- in his system at the time of his death,- as found by Dr. Burrows, she testified that neither “contributed to” Thomas’ death. She explained that,- “without the heroin, [Thomas] doesn’t die.”
After closing arguments, the district court instructed the jury:
If you find the government has proved beyond a reasonable doubt that the defendant knowingly or intentionally distributed a mixture or substance containing a detectable amount of heroin on or about March 29, 2011, you must then determine whether the government has proved beyond a reasonable doubt that death resulted from the use of such substance.
(Emphasis added). After retiring to deliberate, the jury sent a question to the district judge asking whether the phrase “death resulted from the use of the heroin” meant “solely from the use of the heroin or that the heroin contributed to [Thomas’] death.” After the district court asked for advice from counsel about how to respond, counsel for both parties agreed not to provide any clarifying instruction:
[Assistant U.S. Attorney]: Your Honor, we’re of the opinion, and I believe I’ve actually discussed it with defense counsel and for once in the last three days, we’re of the same opinion, that it is a bad idea to provide any additional information.
* * *
Our suggestion is we just say, I’m: sorry, you’ve, got to read the letter of the instructions and interpret it the way that you can, as best as you earn
* * *
[Counsel for Alvarado]: I don’t think you can instruct them further on that. I’m not quite sure what you would instruct them anyway.
The court agreed, noting that “elaborating on a term often makes it less, rather than more, clear.... It is on this ground that some courts, including our own, tell district judges not to try to explain to a jury the *247 meaning of beyond a reasonable doubt. Probably the same is true of results from.”
After the district court discharged a juror for an unrelated reason and empaneled an alternate, the reconstituted jury submitted essentially the same question:
The jury would like clarification on ... the section that says “death resulted from the use of the heroin.” Should that be interpreted as meaning death resulted “exclusively” from the heroin or the heroin contributed to the death?
With the agreement of counsel, the court responded:
Ladies and gentlemen, the Court has received two written questions from you ... at 11:25 this morning. The first question seeks clarification of the, quote, death resulted from the use of the heroin, unquote, language.
My instruction on the law on this issue is set forth on page 25 of the jury instructions and states as follows: [Court' reads the original instruction given to the jury].
You are to consider this instruction, along with all of the other instructions in this case, in reaching your verdict.
The reconstituted jury retired to deliberate and, within 30 minutes, returned a guilty verdict, making two findings: (1) that Alvarado knowingly and intentionally distributed heroin to Thomas on March 29, 2011, and (2) that death resulted from the use of the heroin so distributed.
The district court, sentenced Alvarado, to 20 years’ imprisonment and a 3-year term of supervised release.
[1] On appeal, Alvarado requests a new trial, arguing that (1) the district court should have[1] clarified the “death resulted from” phrase in its jury instructions; (2) the district court should have instructed the jury on the foreseeability of death resulting from Alvarado’s distribution of heroin; and (3) the testimony that Thomas said he purchased heroin from “Pat Boy” constituted inadmissible hearsay and violated Alvarado’s right to confrontation under the Sixth Amendment.
II
Alvarado contends first that, in light of the Supreme Court’s decision in Burrage, the district court erred in failing to clarify for the jury the meaning of the “death results from” statutory .enhancement element of the. offense. : See 21 U.S.C. § 841(b)(1)(C) (enhancing the sentence for drug distribution “if death ,.. results from the use of such substance”); Burrage, 134 S.Ct. at 887 (“Because the ‘death results’ enhancement increase^] the minimum and maximum sentences to which [the defendant is] exposed, .it is an element that must be submitted to the jury and found beyond a reasonable doubt”). He argues that “the jury clearly thought the court’s instruction might permit it to convict if it found that heroin was a mere contributing cause, because it asked about it, twice, receiving no answer either time,” and he notes that “Burrage states that convicting on the contributing cause theory irreversible error.”
The government contends that the district court did not commit any error when responding to the jury because the court accurately stated the controlling law by reciting the specific language of § 841(b)(1)(C). It maintains that, because the Burrage Court concluded that the phrase “death results from” carries its ordinary, commonly understood meaning of but-for causation, the district court appropriately decided not to further explain the phrase. In addition, the government contends that Alvarado-waived this argument by not only failing to object to the court’s response to the jury’s question, but indeed by agreeing that the court should not at *248 tempt to clarify the phrase “death results from” with anything' other than the straightforward statutory' language because of the potential confusion in attempting to define the phrase.
We begin by noting, as clarified at oral argument, that Alvarado does not contend that the instruction that the district court gave was erroneous. Rather; the question presented is whether the court needed to explain further the statutory phrase “results from.” Ordinarily, we review the district court’s decision not' to give a further clarifying instruction for abuse of discretion. See United States v. Foster, 507 F.3d 233, 244 (4th Cir.2007). And when, as in this case, a party fails to object to an instruction or the failure to give an instruction, we review for “plain error.” See Fed.R.Crim.P. 30(d); id. 52(b).
As a general matter,. a district court has an obligation to give instructions to the jury that “fairly state[ ] the controlling law.” United States v. Cobb, 905 F.2d 784, 789 (4th. Cir.1990). Similarly, when the jury asks a clarifying question, the “court’s duty is simply to respond to the jury’s apparent source of confusion fairly and accurately without creating prejudice.” Foster, 507 F.3d at 244 (internal quotation marks and citation omitted).
It is significant that, after the court received the jury’s inquiry to clarify “results from” and told the jury to rely on the instructions as given, leaving it to apply the ordinary meaning of “results from,” Alvarado’s counsel did not complain that the court’s response was unfair or inaccurate. To the contrary, she. explicitly shared the view that any further “clarification” might lead to confusion. Nonetheless, Alvarado now argues, relying on Bur-rage, that the district court’s failure to clarify “results from” allowed the jury to convict him even if heroin was only a contributing cause of Thomas’ death,- a more lenient standard than -but-for causation. But, - in the context of the record in this case, Burrage does not help Alvarado.
The Burrage Court held that “results from” in § 841(b)(1)(C) invokes the “ordinary, accepted meaning” of the phrase. 134 S.Ct. at 891. And the ordinary meaning of “results from” is but-for causation— i.e., that death would not have occurred in the absence of heroin. Id. at 888. Or, as the Court explained, a drug qualifies as a but-for cause of death “if, so to speak, it was the straw that broke the camel’s back.” Id. Thus, a drug that plays a “nonessential contributing role” does not suffice to apply the § 841(b)(1)(C) penalty enhancement. See id. The Court further noted that “results from” was employed in § 841(b)(1)(C) in a way similar to other phrases of but-for causation, such as “because of,” “based on,” and “by reason of.” Id. at 888-89.
In light of Burrage and in the context of this case, we do not find that the district court abused its discretion, let alone committed plain error, in refusing to attempt a clarification of “results from.” There was no evidence in this case that would allow a jury to find that heroin was only a nonessential contributing cause of Thomas’ death. Cf. Burrage, 134 S.Ct. at 890 (“We need not accept or reject the special rule developed for [cases where multiple sufficient causes independently, but concurrently, produce a result], since there was no evidence here that [the victim’s] heroin use was an independently sufficient cause of his death”). As Dr. Suzuki, the only person who testified on causation, stated, “it’s the heroin in [Thomas’] blood ... that caused his death,” and “without the heroin, [Thomas] doesn’t :die.” Indeed, she explained further that neither the Xanax nor the Benadryl “contributed to” Thomas’ *249 death. Moreover, no party suggested that, even without the heroin, Thomas would have died. The only evidence presented was that, but for the heroin, death would not have resulted. As such, any hypothesis that the jury was allowed to convict Alvarado because the heroin played merely a nonessential contributing role in Thomas’ death has no support in the record. In this context, the district court’s decision not to further define “death results from” cannot be found to be an abuse of discretion, let alone plain error. Cf. United States v. Walton, 207 F.3d 694, 698 (4th Cir.2000) (en banc) (“[W]e remain convinced that attempting to explain the words ‘beyond a reasonable doubt’ is more dangerous than leaving a jury to wrestle with only the words themselves”).
We recognize that, in different circumstances where the record might suggest that the decedent ingested heroin but might have died nonetheless from the' effects of other substances, a court’s refusal to clarify the phrase “results from” might become a problem. In such an ambiguous scenario, a jury, without a clarifying instruction, might be allowed to apply the penalty enhancement under § 841(b)(1)(C) even if heroin was not a but-for cause of death. To foreclose such an erroneous finding, the court would likely have an obligation to explain that a drug that plays a nonessential contributing role does not satisfy the results-from causation necessary to apply the enhancement. But, based on the record in this case, we cannot conclude that the district court abused its discretion or committed plain error.
III
Alvarado also contends that the district court erred in failing to instruct the jury that “defendants should only be held liable [under § 841(b)(1)(C) ] for the foreseeable results of their actions.” While he acknowledges that our decision in United States v. Patterson, 38 F.3d 139 (4th Cir.1994), directly contradicts his position, he argues that Patterson no longer controls in light of Burrage, where the Supreme Court held that § 841(b)(1)(C) was an element of the offense, see Bur-rage, 134 S.Ct. at 887. When analyzed as an elemént, according to Alvarado, § 841(b)(1)(C) becomes subject to the same protections - as other elements of an offense. He notes, fdr instáncé, that the Supreme Court has held that, absent clear congressional intent to the contrary, common law “requires the government- to prove that the defendant’s actions were not only a cause of the result, but also that the result was a foreseeable one.” (Emphasis added). Citing Staples v. United States, 511 U.S. 600, 606, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), he also points out that “offenses that require- no mens rea generally are disfavored.”
The government contends that Patterson remains good law, noting that we continue to rely on it in unpublished opinions, and that other courts of appeals have similarly interpreted § 841(b)(1)(C) as containing no foreseeability requirement.
We agree with the government that Patterson remains good law on this issue. The analysis in Patterson did not depend on whether or not § 841(b)(1)(C) served as an element of the offense. Rather, we focused on the meaning of the statutory language, regardless of its role, to conclude that “ § 841(b)(1)(C) imposes no reasonable foreseeability requirement.” Patterson, 38 F.3d at 145. We explained that “the plain language of § 841(b)(1)(C) does not require, nor does it indicate, that prior to applying the enhanced sentence, the district court must find that death resulting from the use of a drug distributed by a defendant was a reasonably foreseeable event.” Id. Indeed, we concluded that the *250 “plain language reveals Congress’ intent” to “put[ ] drug dealers ... on clear notice that their sentences will be enhanced if people die from using the drugs they distribute.” Id.
And the Supreme Court’s decision in Staples does not suggest that § 841(b)(1)(C) should be construed otherwise. The Staples Court did observe, as Alvarado notes, that “offenses that require no mens rea generally are disfavored” and that “some indication of congressional intent, express or implied, is required to dispense with mens.rea as an element of a crime.” 511 U.S. at 606, 114 S.Ct. 1793. But the crime for which Alvarado was convicted does in fact contain •& mens rea requirement. As the Supreme Court noted in Bur rage, “the crime charged ... has two principal elements: (i) knowing or intentional distribution of heroin, § 841(a)(1), and (ii) death caused by (‘resulting from’) the use of that drug, § 841(b)(1)(C).” 134 S.Ct. at 887 (footnote omitted). The first element—knowing or intentional distribution of. heroin—explicitly includes a mens rea. Staples does not suggest that every element of an offénse must. contain a mens rea, directing only that we should think twice before concluding that an offense, viewed as a whole, contains no mens rea requirement. See 511 U.S. at 606, 114 S.Ct. 1793.
As we pointed out in Patterson, § 841(b)(1)(C) does not contain a separate mens rea. 38 F.3d at 145. Rather, it serves to elevate the crime of knowingly or intentionally distributing heroin to a more serious level.
Thus, we conclude that the district court fairly stated the controlling law in refusing to instruct the jury that § 841(b)(1)(C) contains a foreseeability requirement. See Cobb, 905 F.2d at 789.
IV
Finally, Alvarado contends that the district court erred in admitting hearsay that Thomas, the deceased declarant, had said that he purchased heroin from “Fat Boy,” a name referring to Alvarado. Alvarado argues that the hearsay did not fall within any exception to Rule of Evidence 802 (the hearsay rule) and, moreover, that its ád-mission violated the Confrontation Clause, which protects' his right to cross-examine declarants making' “testimonial” statements.
The government contends that the district court properly, admitted the testimony about Thomas’ -statements under the statement-against-interest exception to the hearsay rule contained in Rule of Evidence 804(b)(3). It also maintains that admitting Thomas’ statements did not violate Alvarado’s rights under the Confrontation Clause because Thomas made the statements to friends in. an informal context and therefore the statements were not “testimonial.”
Rule 804(b)(3) provides,’ in releyant part, that a hearsay ’statement made by a declarant who is unavailable as a witness may nevertheless be admitted as evidence if the statement was one that “a reasonable person in the declarant’s position would have made only if the person believed it to be true' because, when made, it ... had so great a tendency to ... expose the declarant to' civil or criminal liability” and if the statement is “supported by corroborating circumstances that clearly indicate its trustworthiness.” ’ Stated otherwise, “hearsay may be admitted under this exception if (1) the declarant is unavailable, (2) the statement is genuinely adverse to the'declarant’s penal interest, and (3) ‘corroborating circumstances clearly indicate the trustworthiness' of the statement.’” United States v. Bumpass, 60 F.3d 1099, 1102 (4th Cir.1995).
*251 Alvarado does not, in making his argument, appear to rely on the first prong, requiring that the declarant be- unavailable, or the third prong, requiring corroborating circumstances that indicate, the trustworthiness of the statements. Rather, he argues that , the second prong, which requires that the statements be adverse to the declarant’s penal interest, was not satisfied. With respect to that prong,- he concedes that the portion of Thomas’ statements in which he admitted to purchasing heroin was “nominally against [his] penal interest”—although “barely so” because Thomas was speaking “only to other drug users and friends.” Rather, he- argues that the “identification of ‘Fat Boy’ as Thomas’ drug source was never against Thomas’ penal interest, and should have been appropriately redacted or excluded in its entirety.” (Emphasis added). We need not, however, resolve whether the identification of “Fat Boy” was sufficiently adverse to Thomas’ interest to fit the Rule 804(b)(3) exception because we conclude that, even if there was error, it was harmless in light of the strength of the other evidence against Alvarado. See United States v. Banks, 482 F.3d 733, 741 (4th Cir .2007).
That evidence all but conclusively confirms that only Alvarado sold heroin to Thomas on the day of his death and that Thomas injected that heroin soon thereafter, resulting in his death. For example, in addition to Thomas’ text-message exchanges with Alvarado, in which Thomas indicates his- intent to buy a bundle of heroin from Alvarado, Alvarado himself admitted, during his custodial interrogation, that he sold heroin to Thomas on the day of the fatal overdose. And the heroin packaging materials found near Thomas’ body were of the type and color used by Alvarado and not. other suppliers from whom Thomas had previously purchased heroin. Also, multiple witnesses confirmed that- Thomas used heroin almost immediately after purchasing, it. - The evidence here indicates as much, as an array of drug - paraphernalia was discovered around Thomas mere hours, after he purchased heroin from Alvarado. No evidence even suggests that Thomas obtained the heroin from anyone other than Alvarado on the day of his death. On this record, we can conclude “with fair assurance, after pondering all that-happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the- error,” if indeed there was error. United States v. Beater, 63 F.3d 311, 325 (4th Cir.1995) (internal quotation marks and citation omitted).
Alvarado’s Confrontation Clause argument is also unpersuasive. That Clause provides that “the accused shall enjoy the right ... to be confronted with the witnesses against him.”. U.S. Const, amend. VI. The Supreme Court has interpreted the Clause as prohibiting the admission of “testimonial” statements from an unavailable declarant,.unless the defendant had a prior opportunity to cross-examine that declarant. Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)” (“Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination”). While the Court has not provided an exhaustive list of what constitutes “testimonial evidence,” the term encompasses such things as “prior testimony at a preliminary hearing, before a grand jury,-or at a former trial; and ... police interrogations.” Id.; see also “Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (explaining that statements in an interrogation qualify as “testimonial when the circumstances objectively indicate that there is no ;.. ongoing emérgen- *252 cy, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution”). But it - is undisputed that testimonial evidence does not include statements made to friends in an informal setting. See United States v. Jordan, 509 F.3d 191, 201 (4th Cir.2007) (“To our knowledge, no court has extended Crawford to statements made by a declarant to friends or associates”) (citing cases from the Second, Sixth, and Eighth Circuits); see also United States v. Dargan, 738 F.3d 643, 650 (4th Cir.2013). (“Harvey made the challenged statements to a cellmate in an informal setting—a scenario far afield from the type of declarations that represented the focus of Crawford’s concern”); United States v. Udeozor, 515 F.3d 260, 270 (4th Cir.2008) (“Because [the defendant] plainly did not think he was giving any- sort of testimony 'when making his statements to the victim during the recorded telephoné calls, the admission of these two taped conversations into evidence did not violate [the defendant’s] rights under the Confrontation Clause”).
In this case, the challenged testimony included statements that Thomas made to his fiancée and to one of his best friends— in an informal setting—that he purchased his heroin from “Fat Boy.” Because such statements were not testimonial, their admission did not implicate the Confrontation Clause.
* * *
. For the reasons given, we affirm the judgment of the district court.

AFFIRMED

. Further, by failing to argue in its appellate brief for application of plain error review and instead recognizing the propriety of review for abuse of discretion, the government has “waived the waiver argument” regarding Alvarado’s purported failure to object to the jury instructions. See United States v. Carthome, 726 F.3d 503, 509 n. 5 (4th Cir.2013) (citation omitted) (collecting cases), called into question, in part on other grounds by Johnson v. United States, — U.S. —, 135 S.Ct. 2551, 2560, 192 L.Ed.2d 569 (2015). Although the government ultimately sought plain error review at oral argument, this belated effort was insufficient to preserve the government’s contention that Alvarado waived his jury instruction challenge at trial. See United States v. Powell, 666 F.3d 180, 185 *254 n. 4 (4th Cir.2011) ("By not presenting any of these arguments in its appellate brief, the Government has abandoned them.” (citing Snyder v. Phelps, 580 F.3d 206, 216 (4th Cir. 2009), aff’d, 562 U.S. 443, 131 S.Ct, 1207, 179 L.Ed.2d 172 (2011))). Thus, review for abuse of discretion is appropriate for this reason as well.