**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-4121**

_____

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

TERRICK ROBINSON,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg.  Thomas S. Kleeh, Chief District Judge.  (1:18−cr−00050−TSK−MJA−1)

_____

Argued:  September 16, 2022                    Decided:  December 9, 2022

_____

Before WILKINSON, WYNN, and DIAZ, Circuit Judges.

_____

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Wilkinson joined, and in which Judge Wynn joined in part.  Judge Wynn wrote an opinion dissenting in part.

_____

**ARGUED:**  Matthew Scott Delligatti, KETTERING DELLIGATTI LAW OFFICES, PLLC, Fairmont, West Virginia, for Appellant.  Brandon Scott Flower, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.  **ON BRIEF:** Randolph J. Bernard, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

_____

1

DIAZ, Circuit Judge:

A jury convicted Terrick Robinson of various offenses relating to his leadership of a drug-trafficking ring, including a charge of distribution of fentanyl resulting in death. On appeal, Robinson advances three main arguments. First, he contends he was denied his right to a speedy trial under the Sixth Amendment and 18 U.S.C. § 3161. Second, he argues the government failed to prove that fentanyl was the but-for cause of the victim's death and that the district court erred in denying his proposed instruction on but-for causation. Finally, he challenges the sufficiency of the evidence supporting his other convictions. Finding no error, we affirm the judgment of the district court.

I.

A.

In 2018, Robinson led a group of drug traffickers that distributed methamphetamine, cocaine, marijuana, and fentanyl in West Virginia. The group—known as the "Georgia Boys"—also included Joel Jimenez and Seddrick Banks, who helped sell the drugs, and William Chappell, who drove the group's car and carried a gun to "make sure no one hurt" Robinson. J.A. 1218.

Lieutenant Brian Purkey, working for a drug task force in West Virginia, began investigating the Georgia Boys in the spring of 2018. In August 2018, a Drug Enforcement Administration officer—Special Agent Brian Roscoe—identified the West Virginia hotel room out of which the Georgia Boys were selling drugs, and he informed Purkey. Purkey set up surveillance units, recording Robinson and Banks staying in the room.

2

Before Purkey could obtain a search warrant for the room, he learned that the Georgia Boys were the subject of a Georgia investigation surrounding a dismembered body found in a dump. Purkey and the Georgia officials agreed to collaborate.

The dismembered body was identified as Courtney Dubois. A forensic toxicologist found methamphetamine and fentanyl in Dubois's liver sample. Dubois's chest fluids tested positive for those drugs as well, along with acetyl fentanyl. The medical examiner ruled the cause of death as "the combined toxic effects of fentanyl, acetyl fentanyl, and methamphetamine." J.A. 1664. He later affirmed there was "a sufficient level [of fentanyl] to be an independent cause of death for [] Dubois, independent of the methamphetamine." J.A. 1671. A forensic anthropologist testified that someone dismembered Dubois's body postmortem.

Chappell testified about Dubois's death. According to Chappell, Robinson brought Dubois to the Georgia Boys' hotel room in Jane Lew, West Virginia. Dubois smoked methamphetamine and marijuana with the group, then snorted a line of fentanyl Robinson laid out for her. About five to ten minutes later, Dubois began "nodding off," "rocking back and forth," and breathing like a "[d]eep snoring." J.A. 1235–36. After failing to rouse her, Chappell fled to another hotel with Jimenez (along with the drugs and money) and told Robinson to call for help.

Chappell returned the next morning to find Dubois in a similar state and left to find Narcan, a drug that can reverse the effects of an opioid overdose. Upon returning, he found that Robinson and Jimenez had put Dubois—who was foaming from the mouth and not

3

breathing—in the bathtub. Robinson told Chappell and Jimenez to get a shovel, a gas can, and matches, but they left without complying.

According to Jimenez, Robinson admitted that he and an unidentified person had "chopped [] up" Dubois and "disposed of her body." J.A. 1377. Surveillance footage of the disposal site shows two men exiting a truck. That truck has the same features as one in a picture on Banks's cellphone. Banks's phone also had pictures of Dubois's body and of a man in a Tyvek suit covered in blood. The GPS data on Robinson's phone placed him near the disposal site.

Meanwhile, the West Virginia officials continued their drug investigation. A confidential informant purchased two packages of drugs from Robinson. The DEA tested the drugs, concluding that the larger package was 95% pure methamphetamine and the smaller one was 8% pure fentanyl.

Police arranged a second controlled buy, this time in Room 202 of the Red Roof Inn in White Hall, West Virginia. A confidential informant paid $5,500 and Robinson handed him a pound of methamphetamine. Robinson left the room.

Officers then executed a search warrant for the room. Inside were Chappell, Banks, and a man that provided housing for the Georgia Boys' operation. Officers recovered a loaded firearm on Chappell, a handgun in the bathtub, methamphetamine, cocaine, three cellphones, gallon-sized plastic bags, two digital scales, and the money from the controlled purchase.

Police stopped and arrested Robinson and searched his car. They found room keys, cash, and a cell phone on his person, and four guns with ammunition in the car.

4

The next morning, a Red Roof Inn housekeeper found a bag containing white powder in Room 202. He reported it to his manager, who called the police. The police took custody of the bag, which was delivered to Purkey. Purkey gave the bag to Steve Martin, a DEA task force officer, who in turn delivered it to Roscoe. Roscoe had the bag's contents tested. The powder was 52 grams of fentanyl of an undetermined purity level.

B.

A grand jury in the Northern District of West Virginia indicted Robinson, Chappell, and Banks on October 3, 2018. It issued a superseding indictment on March 19, 2019. The superseding indictment added Jimenez and charged Robinson with eight crimes:

Count One: Conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 846;

Count Two: Distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii);

Count Three: Aiding and abetting possession with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii);

Count Four: Aiding and abetting possession with the intent to distribute cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C);

Count Seven: Aiding and abetting possession with the intent to distribute fentanyl; in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi);

Count Eight: Aiding and abetting the use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A);

Count Nine: Use and carry of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and

Count Ten: Distribution of fentanyl resulting in serious bodily injury or death, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).

5

While awaiting trial, Robinson moved to dismiss his indictment under the Speedy Trial Act and the Sixth Amendment. The government responded that it had not proceeded to trial because it wanted to conduct a joint trial with Robinson and Banks, who was in Georgia's custody until November 2019. The court denied the motions after a hearing in December 2019.

After Banks was released from state custody, his counsel moved to continue the federal proceedings. The district court granted the motion to continue and severed Robinson's and Banks's trials. Although the court found that Robinson's speedy-trial right hadn't yet been violated, it worried that waiting for Banks's counsel to be prepared for trial risked doing so.

C.

Robinson's trial began on January 7, 2020. During opening statements, defense counsel claimed the "15- or 16-month wait" to begin the trial was "because the Government tried to cheat on the timeline." J.A. 214. The government objected, and defense counsel responded that the matter went to "a credibility issue of the officers." J.A. 215. The court sustained the objection, explaining that any delay was a "litigation strategy issue[]," "not [a] law enforcement issue[]," and thus was not relevant to officer credibility. J.A. 216.

A similar issue arose during the defense's cross-examination of Lieutenant Purkey. The government objected to questions about Chappell's arrest and indictment. Defense counsel argued the line of questioning was "relevant to the investigation" because "it set[] forth the timing of the events." J.A. 361. When the court asked how the timing was relevant, defense counsel reiterated the officer-credibility argument her co-counsel

6

advanced during the opening statement. The court sustained the objection, again finding that the timing of the legal proceedings was irrelevant.

After the government rested, Robinson moved to dismiss all eight counts of the indictment against him. The district court denied the motion.

The court and counsel then discussed jury instructions. On Count Ten, counsel for Robinson requested that the court add an instruction on "but-for cause." J.A. 2066–68. The court declined and instructed the jury:

> The crime of distributing fentanyl resulting in death or serious bodily injury . . . has three elements, which are: one, the defendant intentionally transferred fentanyl to [Dubois]; two, at the time of the transfer, the defendant knew that it was a controlled substance; and three, the fentanyl transferred by the defendant was an independently sufficient cause of death of [Dubois]. The Government must prove the unlawfully transferred fentanyl was an independently sufficient cause of death of [Dubois] and not merely part of a combination of factors which resulted in death.

J.A. 2131. Robinson argued during closing statements that the government hadn't proven "it was just fentanyl that was the cause of death." J.A. 2220.

The jury convicted Robinson on all counts. Robinson moved for acquittal or, in the alternative, for a new trial. The district court denied the motion. *United States v. Robinson*, 459 F. Supp. 3d 701 (N.D. W. Va. 2020). It then sentenced Robinson to concurrent life sentences for Counts One, Two, Three, and Ten; concurrent 20- and 40-year sentences for Count Four and Count Seven, respectively; and consecutive five-year sentences for Count Eight and Count Nine.

7

## II.

On appeal, Robinson reprises his challenges to his convictions: first, that his speedy-trial rights were violated; second, that the government failed to prove but-for causation for Count Ten (and that the court erred by failing to instruct the jury as to the same); and third, that insufficient evidence supported his convictions.  We consider each contention in turn.

### A.

Robinson argues that the delay in commencing his trial violated both the Speedy Trial Act and the Sixth Amendment, and that the district court erred in preventing his counsel from arguing that the government impermissibly delayed his trial.  We disagree.

#### 1.

The Speedy Trial Act provides:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an . . . indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1).  But the Act excludes certain periods from this 70-day limit, including a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."  *Id.* § 3161(h)(6).  We review de novo a district court's legal interpretation of the Act.  *United States v. Shealey*, 641 F.3d 627, 631 (4th Cir. 2011).

Robinson argues that the delay between the superseding indictment and Banks's initial appearance was unreasonable.  "All defendants who are joined for trial generally fall

8

within the speedy trial computation of the latest codefendant." *Henderson v. United States*, 476 U.S. 321, 323 n.2 (1986). While the superseding indictment was filed on March 19, 2019, Banks—Robinson's codefendant—didn't appear until November 2019. So we must determine whether, under § 3161(h)(6), the roughly eight-month gap between the filing of the superseding indictment and Banks's initial appearance was "reasonable." *See United States v. Crockett*, 813 F.2d 1310, 1317 (4th Cir. 1987).

On that issue, we look to the defendant's attempts (or lack thereof) to move for severance, prejudice to the defendant, and the length of the delay. *See United States v. Clyburn*, 1995 WL 578047, at *2 (4th Cir. Oct. 2, 1995) (per curiam). Robinson never moved for severance. Nor does he cite any particularized prejudice arising from the delay—the "anxiety and concern" and witnesses' "loss of memory" he identifies are common to all defendants whose trials are delayed. Appellant's Br. at 12–13. Finally, an eight-month delay is within the realm of those we and our sister courts have held to be reasonable. *See, e.g.*, *Clyburn*, 1995 WL 578047, at *2 (147 days); *United States v. Margheim*, 770 F.3d 1312, 1319 (10th Cir. 2014) (10 months); *United States v. Vasquez*, 918 F.2d 329, 334 (2d Cir. 1990) (22 months).

We conclude that the eight-month period between the filing of the indictment and the appearance of Robinson's codefendant was a "reasonable period of delay" that the district court properly excluded under the Act. So we affirm the district court on this point.

2.

Nor did any delay violate Robinson's Sixth Amendment right to a speedy trial. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the

9

right to a speedy and public trial." U.S. Const. amend. VI. Reviewing the district court's decision de novo, *United States v. Hall*, 551 F.3d 257, 266 (4th Cir. 2009), we consider the four factors the Supreme Court articulated in *Barker v. Wingo*: (1) the "length of the delay"; (2) "the reason for the delay"; (3) "the defendant's assertion of his right"; and (4) the "prejudice to the defendant." 407 U.S. 514, 530 (1972).

The government concedes that the 490-day period between Robinson's arrest and trial is a "presumptively prejudicial" delay. Appellee's Br. at 22 (citing *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)). But the other *Barker* factors favor the government.

On the second factor, "[t]he reasons for a trial delay should be characterized as either valid, improper, or neutral." *Hall*, 551 F.3d at 272. "[W]aiting for another sovereign to finish prosecuting a defendant is without question a valid reason for delay." *United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1998). And "[v]alid reasons for delaying a trial are weighed in favor of the [g]overnment." *Id.* Because the government was awaiting Georgia's prosecution of Banks, the reason for delay weighs in its favor. It's immaterial whether, as Robinson argues, the government "had the ability to secure Banks's appearance and set a trial date." Appellant's Br. at 10. "The need to allow [a defendant] to be prosecuted by the State without interference by the federal government" is an "obvious reason" to delay federal proceedings. *United States v. Thomas*, 55 F.3d 144, 150 (4th Cir. 1995).

The third factor—the defendant's assertion of his right to a speedy trial—likewise weighs in the government's favor. Robinson asserted his speedy-trial right on September 30, 2019, over a year after his arrest. And Robinson's trial started 100 days after that.

Given that Robinson had counsel since his arrest and his trial started not long after he asserted his speedy-trial right, this factor favors the government. *See Grimmond*, 137 F.3d at 829 (holding that the defendant's failure to assert his right to a speedy trial weighed in the government's favor where he asserted that right four months before the trial began).

The fourth factor, prejudice, also favors the government. When analyzing prejudice, we consider three interests of defendants: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. The third interest is the "most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*.

The first interest supports Robinson's position but the second and third don't. Robinson was in jail during the lead-up to his trial, but he identifies no "restraint on liberty, disruption of employment, strain on financial resources, or exposure to public obloquy that was greater than that faced by anyone openly subject to criminal investigation." *Hall*, 551 F.3d at 272 (cleaned up). Indeed, the only interest Robinson discusses is the third. And even then, the only prejudice Robinson identifies is "loss of memory for both Robinson himself and witnesses." Appellant's Br. at 12–13. Yet Robinson fails to provide a single example of something relevant to his case that he or another witness couldn't remember. Without such an example, Robinson merely alleges a generalized prejudice common to all cases and all delays. *See Hall*, 551 F.3d at 273.

On balance, the four constitutional speedy-trial factors weigh in the government's favor. So we hold that the district court didn't err in denying Robinson's motion.

11

3.

Robinson further contends that the district court denied him the opportunity to argue that the government impermissibly delayed his trial. During the objection colloquy in opening statements, Robinson's attorney argued that he should be allowed to discuss the delay of the trial because it went to "a credibility issue of the officers." J.A. 215. Another of Robinson's attorneys reiterated the same argument during Lieutenant Purkey's cross-examination. Both times, the government objected that the timing of the proceedings was irrelevant, and the court sustained the objections.

We review a district court's decisions on questions of relevance for abuse of discretion, *Deans v. CSX Transp., Inc.*, 216 F.3d 398, 400 (4th Cir. 2000), and find no such abuse here. The prosecution's decisions about how and when to prosecute Robinson don't reflect upon Purkey's (or any other law enforcement witness's) credibility. So we agree with the district court that this evidence wasn't relevant to any question before the jury.

B.

1.

Next, Robinson argues that the district court should have acquitted him on Count Ten, distribution of fentanyl resulting in serious bodily injury or death, because the government didn't prove the fentanyl Robinson gave to Dubois was the but-for cause of her death. We find no reversible error.

We review de novo the denial of a motion for judgment of acquittal. *United States v. Zelaya*, 908 F.3d 920, 925 (4th Cir. 2018). We will uphold the jury's verdict if, viewing the evidence in the light most favorable to the government, "the verdict is supported by

12

substantial evidence." *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018). "Substantial evidence is that which a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id*. (cleaned up).

Count Ten of the superseding indictment charged that Robinson "distribute[d] fentanyl, a Schedule II controlled substance, to [Dubois] . . . and death and serious bodily injury resulted from use of the fentanyl." J.A. 29. The charge invoked 21 U.S.C. § 841(b)(1)(C), which enhances the sentence for drug distribution "if death . . . results from the use of such substance." In *Burrage v. United States*, the Supreme Court held that the inclusion of "results from" in the text of § 841(b)(1)(C) means that "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable" under the provision "unless such use is a but-for cause of the death or injury." 571 U.S. 204, 218 (2014).

In other words, the government can prove that "death result[ed]" from a drug in one of two ways. It can prove but-for causation: that "death would not have occurred in the absence" of the drug. *United States v. Alvarado*, 816 F.3d 242, 248 (4th Cir. 2016). Or it can prove that the drug was an independently sufficient cause of the victim's death, allowing courts to find causation in the "special circumstance" when "multiple, independent causes concurrently cause death." *United States v. Campbell*, 963 F.3d 309, 316 (4th Cir. 2020).

At trial, the prosecution pursued the "independently sufficient" theory of causation. *See* J.A. 1988. Dr. Colin Hebert, the medical examiner, testified that the levels of fentanyl

13

found in Dubois's liver and chest fluid were "well above the upper limits of the fatal or lethal range." J.A. 1675. He repeatedly affirmed that the fentanyl in Dubois's system was sufficient to cause her death "independent of methamphetamine" or other drugs she had taken. J.A. 1671; *see also* J.A. 1682 ("[T]he fentanyl level, on its own, is enough to cause death").

We pause here to discuss one procedural oddity. Three days before oral argument, the government averred that it no longer believed the "independently sufficient" theory applied to Robinson's case. Citing *Campbell*, the government suggested that this theory is available only when the evidence supports "at least *two* independent causes of death," and in Robinson's case, it had "only argued one cause of death: fentanyl." Dkt. 31 at 2–3 (emphasis added). The government concluded that it "should have been required to prove but-for causation" on Count Ten. *Id.* at 3.

We commend the government for its candor. Still, "our judicial obligations compel us to examine independently the errors confessed." *Young v. United States*, 315 U.S. 257, 258–59 (1942).* And here, the overwhelming evidence that Dubois's death resulted from fentanyl supports liability under either theory of causation. *Cf. United States v. Seals*, 915 F.3d 1203, 1206 (8th Cir. 2019) (where the evidence showed that a drug "could have been

---

* Our dissenting colleague takes issue with our decision to evaluate this issue for ourselves rather than remanding to the district court. And we certainly agree that our court must be "[m]indful of our role as arbiter and not advocate." *United States v. Holness*, 706 F.3d 579, 591–92 (4th Cir. 2013). But where (as here) the government has misapprehended the law and the facts are "sufficiently developed to readily permit" our review, we may exercise our "inherent authority" to assess the government's confession ourselves. *Id.* at 592.

14

either a but-for cause or an independently sufficient cause . . . [t]his created a factual issue for the jury to resolve rather than an absolute legal bar to conviction.").

In a perfect world, the government would have presented a but-for theory at trial. But "substantial rights are not affected when a picture-perfect proceeding would yield exactly the same result as that which actually transpired." *United States v. Godwin*, 272 F.3d 659, 673 (4th Cir. 2001). While the prosecution didn't ask Dr. Hebert directly whether Dubois would have lived but for the fentanyl, the evidence compels that conclusion. Dr. Hebert testified that fentanyl is an opioid, and that when a person dies from an opioid overdose, their "breathing slows," they "pass out or fall asleep," and their "heart slows down." J.A. 1665–66. Those symptoms mirror Chappell's description of Dubois. Dr. Hebert also noted that opioid overdoses can cause a person to foam from the mouth, consistent with Chappell's account and a postmortem photograph of Dubois's body. Finally, as Chappell testified, these symptoms took hold "not even five, ten minutes" after Dubois snorted the line of fentanyl. J.A. 1235.

When a person overdoses on a stimulant like methamphetamine, by contrast, Dr. Hebert testified that they most commonly experience "a heart attack, chest pains, fairly sudden." J.A. 1664–65. No witness reported Dubois experiencing any such symptoms, and the autopsy didn't reveal any damage to her heart.

Dubois's symptoms were consistent with an opioid overdose, which manifested shortly after she took the drugs. That, coupled with the lack of methamphetamine overdose indicators, constituted substantial evidence supporting the jury's verdict. "[B]ecause there was no evidence in the record that [Dubois] could have died without the [fentanyl], the

15

jury's verdict was necessarily consistent with . . . but-for causation." *Alvarado*, 816 F.3d at 244.

That said, the evidence also supports Robinson's conviction under the "independently sufficient" theory of causation. It's true that the autopsy report listed Dubois's cause of death as the "combined toxic effects of fentanyl, acetyl fentanyl, and methamphetamine." J.A. 1664. But Dr. Hebert also repeatedly stated that the amount of fentanyl in Dubois's system was enough to cause her death independent of any other drug she had taken. The jury reasonably could have concluded that the fentanyl was an independently sufficient cause of her death.

The government's confession of error overthinks the issue. Because the prosecution proved the fentanyl Dubois ingested was alone sufficient to kill her, it didn't also need to prove that either the methamphetamine or acetyl fentanyl was an *additional* independently sufficient cause. Such a requirement would stray from the language of the statute and the Supreme Court's holding in *Burrage*, both of which focused on the drug distributed by the defendant—not on any other drugs that the victim may have taken. 21 U.S.C. § 841(b)(1)(C) (enhancing sentence if death results "from the use of such substance"); 571 U.S. at 216.

True, this case may not present the same causal indeterminacy as the Court's example in *Burrage*, where the hypothetical victim is simultaneously stabbed and shot and both wounds are independently fatal. 571 U.S. at 214–15. But we decline to create uncertainty where none exists. Whether the methamphetamine Dubois took was also

16

sufficiently lethal doesn't affect Robinson's culpability for supplying a fatal dose of fentanyl.

In sum, substantial evidence establishes that Dubois ingested a dose of fentanyl sufficient to cause death, even if taken on its own. And the evidence also supports that she in fact died from the fentanyl. We conclude that the jury could have found that "the [fentanyl] was not only a necessary, but-for cause of the death, but it was also independently sufficient, by itself, to cause [Dubois's] death, even without the influence of any other factors." *USA v. Feldman*, 936 F.3d 1288, 1313 (11th Cir. 2019). So while this case may have been more appropriately tried under a but-for causation theory, we find no reversible error on Count Ten.

2.

Robinson also contends that the district court erred by denying his request to instruct the jury on "but-for" causation as to Count Ten. We review a court's decision not to give a particular instruction for abuse of discretion, reversing "only if the proffered instruction: (1) was correct, (2) was not substantially covered by the charge that the district court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense." *United States v. Hager*, 721 F.3d 167, 184 (4th Cir. 2013). And even if these factors are met, we do not reverse "unless the defendant can show that the record as a whole demonstrates prejudice." *Id.* We find no reversible error here.

The district court instructed the jury that the government had to "prove the unlawfully transferred fentanyl was an independently sufficient cause of death of [Dubois]

17

and not merely part of a combination of factors which resulted in death." J.A. 2131. Even assuming that it would have been correct to mention "but for" causation in the instruction, the district court's instruction effectively eliminated the danger identified in *Burrage*—convicting when the drug was neither a but-for nor independently sufficient cause of death, but merely a contributing factor to it. *See* 571 U.S. at 215–16.

More importantly, Robinson can identify no prejudice stemming from the allegedly incomplete instruction. As discussed above, we're convinced that the "independently sufficient" theory was available to the government, and the evidence was sufficient to convict under it. Adding an explanation of "but for" causation wouldn't change this outcome. Thus, even if the district court erred (and we question whether it did), the error wasn't prejudicial.

C.

Finally, Robinson challenges the sufficiency of the evidence supporting several of his other convictions. On four of the drug-possession and distribution charges (Counts One through Four), he claims the testimony presented at trial came from "unreliable witnesses." Appellant's Br. at 23. On the fentanyl-possession charge (Count Seven), he focuses on the "irreparably broken" chain of custody for the bag containing the fentanyl found by the housekeeper. *Id*. at 21. On the firearm-related charges (Counts Eight and Nine), he claims that the evidence didn't support the jury's finding that he used or carried a firearm, or that he knew Chappell did.

Again, we review the denial of a motion for judgment of acquittal de novo, upholding the jury's verdict if it is supported by substantial evidence. *Burfoot*, 899 F.3d at

18

334.  We're "not entitled to assess witness credibility" and must "assume that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018) (cleaned up).

As we explain, substantial evidence supports the convictions.  We therefore affirm the district court's denial of Robinson's motion for judgment of acquittal.

1.

Robinson challenges Counts One through Four because the testimony supporting them "derived from unreliable witnesses who included persons suffering from drug addictions" and because "the jury was not provided adequate information to make a credibility determination." Appellant's Br. at 23–24.  Neither contention persuades.

Credibility determinations "are within the sole province of the jury and are not susceptible to judicial review." *United States v. Louthian*, 756 F.3d 295, 303 (4th Cir. 2014) (cleaned up).  So whether some of the government's witnesses were drug users is irrelevant.  That's no basis to overturn the jury's verdict.

Here, the jury could assess the credibility of the government's witnesses.  They were all available for cross-examination.  And Robinson was free to argue that the government's witnesses were unreliable during closing arguments.  Finally, the judge instructed the jurors that they "should consider all of the facts and circumstances in evidence to determine which of the witnesses [they chose] to believe or not believe." J.A. 2096.  We decline to second-guess their determinations.

2.

19

Robinson also asserts that there was insufficient evidence to convict him on Count Seven, possession with intent to distribute fentanyl. He focuses on what he calls "the irreparably broken" chain of custody for the bag in which authorities found the fentanyl. Appellant's Br. at 21. The government responds that it properly authenticated the evidence through witness testimony. We agree.

"The chain-of-custody requirement is simply a variation of the principle that real evidence must be authenticated prior to its admission into evidence." *United States v. Jones*, 356 F.3d 529, 535 (4th Cir. 2004) (cleaned up). The purpose of requiring the government to establish the chain of custody, therefore, is to "establish that the item to be introduced is what it purports to be so as to convince the court that it is improbable that the original item had been exchanged with another or otherwise tampered with." *Id.* (cleaned up).

The government offered sufficient evidence that no one tampered with the bag or the drugs in it. The hotel's housekeeper found the bag and reported it to his manager. His manager called the police, and the local police chief took the drugs. The local police chief then gave the drugs to Purkey. Purkey gave the drugs to Martin, the DEA task force officer, who in turn delivered them to Roscoe. From there, Roscoe followed the standard procedure for having the drugs tested. Robinson cross-examined all these witnesses and argued that the evidence was unreliable during closing arguments.

It was within the jury's purview to credit the government's version of events.

3.

20

Robinson next argues that the district court should have acquitted him of Count Eight, aiding and abetting the use of a firearm during a drug-trafficking crime. He claims that "[t]he evidence presented at trial did not show that Robinson used a firearm during or relating to a drug trafficking crime." Appellant's Br. at 19. He also says there's insufficient evidence showing he aided Chappell in doing so. These arguments are meritless.

To aid and abet an 18 U.S.C. § 924(c) offense, one must (1) "ha[ve] prior knowledge of [a] gun's involvement" in a drug trafficking crime, and (2) "knowingly and actively participate[] in the drug trafficking crime." *Rosemond v. United States*, 572 U.S. 65, 82 (2014) (cleaned up). The government showed, as Robinson concedes, that he "hired Chappell to work with him and protect him." Appellant's Br. at 19. Robinson knew Chappell carried a gun. And the purpose of carrying a gun was "[t]o make sure no one hurt" Robinson while trafficking drugs. J.A. 1219. So sufficient evidence supports Count Eight.

Finally, Robinson claims that the district court should have acquitted him of Count Nine—use and carry of a firearm during and in relation to a drug trafficking crime. This argument too fails.

A person may not "use[] or carr[y] a firearm" "during and in relation to any . . . drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). Yet Jimenez saw Robinson carrying a .380 handgun "[a] time or two," and Robinson once gave the gun to Jimenez. J.A. 1347. Officers recovered that gun in passenger's side of Robinson's car (along with three others in the trunk). And Chappell saw Robinson with the gun in the front passenger's seat. Sufficient evidence supports Count Nine.

21

III.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

WYNN, Circuit Judge, dissenting in part:

Three days before oral argument in this case, the government abandoned its argument on the question of whether the fentanyl that defendant Terrick Robinson gave Courtney Dubois caused her death to sustain his conviction under 21 U.S.C. § 841. In full, the government's letter confessing error reads as follows:

I write concerning the pending matter in *United States v. Terrick Robinson*, Case No. 21-4121. The purpose of this letter is to confess error regarding the third and eighth errors alleged by the appellant in his brief. This matter is scheduled for oral argument on Friday, September 16, 2022.

The Government filed its responsive brief on August 24, 2021. The Government argued to affirm the appellant's conviction for Count 10 of the Superseding Indictment charging Distribution of Fentanyl Resulting in Serious Bodily or Death. Specifically, the Government argued that the district court did not err by denying the appellant's Rule 29 motion for judgment of acquittal when the appellant asserted that the Government did not prove that fentanyl was the but-for cause of death of the victim, C.D. Further, the Government argued that the district court did not err when it refused to instruct the jury on but-for causation. As to both grounds, the Government argued that pursuant to *United States v. Burrage*, 571 U.S. 204 (2014), its theory of the case was that fentanyl was an independent sufficient cause of death of C.D. and the evidence presented to the jury supported only this theory, and not but-for causation. The district court denied the appellant's Rule 29 motion and refused to instruct the jury on but-for causation reasoning that the Government's theory was that the fentanyl was an independent sufficient cause of death, and the Government never asserted the but-for causation theory.

In preparing for the upcoming oral argument, the Government reviewed the *Burrage* opinion and has reconsidered its position that fentanyl was an independent sufficient cause of death. The Government now concedes that the district court erroneously denied the defendant's Rule 29 motion for judgment of acquittal on Count 10 and erroneously instructed the jury on the independent sufficient cause of death. The Government and the district court misunderstood the application of the independent sufficient cause of death theory and did not appreciate that multiple independent causes of death are necessary for the theory to apply.

23

In *Burrage*, the United States Supreme Court explained that death resulting from the distribution of controlled substances can be proven in one of two ways. The court held, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." 571 U.S. at 218-219. While the *Burrage* court focused primarily on the test for but-for causation, the court described the independent sufficient cause theory:

> [C]ourts have not *always* required strict but-for causality, even where criminal liability is at issue. The most common (though still rare) instance of this occurs when **multiple sufficient causes independently**, but concurrently, produce a result. See *Nassar, supra,* at ——, 133 S.Ct., at 2525; see also LaFave 467 (describing these cases as "unusual" and "numerically in the minority"). To illustrate, if "A stabs B, inflicting a fatal wound; while at the same moment X, acting independently, shoots B in the head ... also inflicting [a fatal] wound; and B dies from the combined effects of the two wounds," A will generally be liable for homicide even though his conduct was not a but-for cause of B's death (since B would have died from X's actions in any event). *Id*., at 468 (italics omitted). We need not accept or reject the special rule developed for these cases, since there was no evidence here that Banka's heroin use was an independently sufficient cause of his death. No expert was prepared to say that Banka would have died from the heroin use alone.

*Id*. at 214-15 (Emphasis added). In *United States v. Campbell*, this court discussed the *Burrage* decision and also explained the independent sufficient cause of death theory:

> Though *Burrage* held that but-for causation was generally required to prove that death resulted, the Supreme Court acknowledged that but-for causation might *not* be required in the special circumstance where evidence establishes that multiple sufficient causes independently, but concurrently, caused death. 571 U.S. at 214, 134 S.Ct. 881. To illustrate, the Court described a victim who was simultaneously stabbed and shot by different assailants. *Id*. at 215, 134 S.Ct. 881. In that situation, the conduct of neither the stabber nor the shooter was the but-for cause of the victim's death. *Id.* Even so, the stabber

24

would generally be liable for homicide. *Id*. Although the Supreme Court determined that this special circumstance did not apply in Burrage's case, it made clear that the special circumstance would permit a jury to find causation when two sufficient causes independently and concurrently caused death. *Id*. at 214-15, 134 S.Ct. 881.

963 F.3d 309, 316 (4th Cir. 2020).

Based upon the *Burrage* and *Campbell* opinions, it is clear that the evidence must support at least two independent causes of death for the independent sufficient cause of death theory to apply. In appellant's case, the Government only argued one cause of death: fentanyl. While the evidence showed C.D. had two other controlled substances in her system, acetyl fentanyl and methamphetamine, no evidence was presented that either of these substances alone could have caused C.D.'s death. Thus, the independent sufficient cause of death theory should not have been available to the Government. The Government should have been required to prove but-for causation. The district court should have granted the appellant's Rule 29 motion because the Government did not prove that fentanyl was the but-for cause of death. Further, assuming the district court denied the Rule 29 motion, it should have instructed the jury using the but-for cause of death theory with the evidence presented at trial. The district court did not instruct the jury on but-for causation.

The Government asserts that the appropriate relief concerning Count 10 of the Superseding Indictment is to order the conviction be vacated and to remand to the district court with an order to direct entry of judgment on the lesser-included offense of Distribution of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). This court has the "power to direct entry of judgment on a lesser included offense when vacating a greater offense for insufficient evidence." *United States v. Hickman*, 626 F.3d 756, 770 (4th Cir. 2010). Here, the jury necessarily found the elements for distribution of fentanyl when reaching its verdict of guilty as to Count 10. The court should "'limit the use of judgment reformation to those circumstances when what is sought is a conviction for a lesser offense whose commission can be established from the facts that the jury actually found.'" *United States v. Blue*, 808 F.3d 226, 237 (4th Cir. 2015) (citation omitted).

The undersigned consulted with counsel for the appellant regarding this issue. Counsel has authorized me to state that he does not object to the Government's change in position regarding the confession of error. However, counsel has not had sufficient time to consider the appellant's

25

position regarding the appropriate relief or whether the confession of error raises other issues that may affect his client's rights.

Thank you for your attention to this matter. Please let me know if you have any questions.

In withdrawing its challenge "regarding the third and eighth errors alleged by the appellant in his brief," the government fully recognized that on the remaining charges, which this panel affirms unanimously, Robinson would remain in prison to serve three concurrent life terms. But rather than accept the government's decision on how to handle the prosecution of this appeal, my good colleagues in the majority dismissed the government's withdrawal as a "procedural oddity," Majority Op. at 14, and provided an opinion on an issue that is no longer contested by the parties.

I write separately to emphasize that our role as judges is to remain as neutral arbiters and resist taking on the role of prosecutor in criminal cases. Afterall, it is the U.S. Department of Justice that prosecutes federal criminal cases. That department decides which charges to bring and, importantly, which ones not to bring. It is well recognized that the decision of whether to prosecute at all is "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see Chiles v. United States*, 874 F. Supp. 1334, 1340 (S.D. Fla. 1994) (government "has exclusive authority and absolute discretion to decide whether to prosecute a case"), *aff'd*, 69 F.3d 1094 (11th Cir. 1995). And if that is not the case, then where do we as appellate judges draw the line between judge and advocate? The majority characterizes the government's abandonment of this issue as a misapprehension and says we can address the issue because the facts are sufficiently

26

developed. Majority Op. at 14 n.\*. But as far as I can tell, this approach has no obvious limiting principle on when courts can override the decision of the prosecutor on when and how to prosecute.

To be sure, it seems somewhat inconsistent that when it is the *defendant* who fails to press an argument, we are quick to deem the argument abandoned. *See, e.g.*, *United States v. Rendelman*, 641 F.3d 36, 42 n.7 (4th Cir. 2011) (defendant abandoned argument by not pursing it on appeal); *United States v. Martin*, 523 F.3d 281, 287 n.2 (4th Cir. 2008) (same). Surely, in this case, there is no reason to step into the role of counsel for the government.

And even if we were so tempted, we should remind ourselves that we are but appellate judges, not trial judges. So at the very least, we should restrain ourselves and remand to the district court to consider the government's confession in the first instance. That's what we have done in other cases. *See, e.g.*, *United States v. Jackson*, 336 F. App'x 282, 284 (4th Cir. 2009) (per curiam). Doing so would respect the district court's close relationship with the case and reap the benefits that additional briefing could bring to the issue on remand.\*

---

\* As the majority observes, we have, at times, chosen to independently examine the grounds for a confession of error by the government. Majority Op. at 15. But just because we have done something in the past does not mean it was right to do it then, or that it is right to reflexively do it forever without considering *why* we do so. A confession by the government is nothing more than a higher degree of abandonment or withdrawal of an argument. So, even if we chose to not accept the government's confession, we should nevertheless dismiss the matter as abandoned or withdrawn, consistent with how we normally handle an argument that has been abandoned on appeal.

In sum, with respect for my good colleagues in the majority, we should be "[m]indful of our role as arbiter and not advocate," and we should "make no habit of venturing beyond the confines of the case on appeal to address arguments the parties have deemed unworthy of orderly mention." *United States v. Holness*, 706 F.3d 579, 591–92 (4th Cir. 2013). Such is the judicious approach.

Respectfully, I dissent from Part II.B of the majority opinion. I concur as to the remainder of the opinion.

28